**Sewelle H. EARLE, Appellant,**

v.

**UNITED STATES, Appellee.**

**Owen WHITE, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 89–CF–484, 89–CF–1010.

District of Columbia Court of Appeals.

Submitted Nov. 6, 1991.
Decided July 28, 1992.

---

Daniel J. McGuan, appointed by this court, filed a brief, for appellant Earle.

B. Milele Archibald, appointed by this court, filed a brief, for appellant White.

Jay B. Stephens, U.S. Atty., and John R. Fisher and Thomas J. Tourish, Jr., Asst. U.S. Attys., were on the brief in the case of appellant Earle, for the U.S.

Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas J. Tourish, Jr., and Kristan Peters–Hamlin, Asst. U.S. Attys., were on the brief in the case of appellant White, for the U.S.

Before ROGERS, Chief Judge, FERREN, Associate Judge, and MACK, Senior Judge.

FERREN, Associate Judge:

The grand jury charged appellants Sewelle Earle and Owen White, along with codefendant Lattival W. McKenzie,[1] with possession with intent to distribute cocaine and possession with intent to distribute marijuana, D.C.Code § 33–541(a)(1) (1988), and with unlawful possession of drug paraphernalia, D.C.Code § 33–603(a) (1988). White filed a motion to suppress tangible evidence. After a hearing, Judge Warren King denied the motion on January 12,

---

1. Mr. McKenzie was convicted but has not noted an appeal.

1989. A joint jury trial of all three codefendants began the same day. Both appellants moved for judgment of acquittal at the close of the government's case The trial court denied the motions. The jury convicted appellants on all three counts on January 24, 1989. Both appellants filed timely notices of appeal, which we have consolidated.

White raises four issues. First, he challenges the trial court's denial of his motion to suppress tangible evidence. He argues that the arresting officers' initial entry into his home, achieved by force at night without a warrant, violated the Fourth Amendment. White also argues that even if the initial entry was lawful, the officers' protective search of the basement area, where they found a large stash of drugs, was unlawful because the basement was a separate dwelling unit for which they had no sound basis for a warrantless entry. Second, White challenges the sufficiency of the evidence of intent to distribute. He contends that the only quantity of drugs consistent with distribution was found in the basement, not in his first floor apartment, and that there was no evidence linking him to the drugs and paraphernalia found in the basement. Third, White argues that the trial court erred in instructing the jury on aiding and abetting when there was no connection between him and the drugs in the basement. Finally, White challenges the emphasis the prosecutor placed on his prior criminal record and especially the prosecutor's reference to an unproved conviction in closing argument. We are not persuaded by appellant's contentions.

Earle appeals from the trial court's denial of his motion for judgment of acquittal, and from his conviction, on the ground that the government failed to prove that Earle constructively possessed the drugs in question or that he had the intent to distribute them. We find no error.

## I. THE FACTS.

Police Officers Ronald Carroll and Michael Soulsby were partners on the midnight shift assigned to Scout Car 132 in the Fourth District of the Metropolitan Police Department. On February 20, 1988, they went to roll call at about 10:30 p.m. There they heard about a multiple homicide which had occurred a few hours earlier in an area included on their beat. Although the details were sketchy, the officers learned that the murders involved handguns and that the suspects were three Jamaican men.

About half an hour later, while on patrol, Carroll and Soulsby received a radio run informing them that someone had reported the sounds of gunshots inside a residence at 1213 Park Road,[2] about a block away from their location and six blocks from the earlier murders. The officers immediately responded to the call. Officer Soulsby went to the front door while Officer Carroll stood a few feet away behind a tree, watching the front windows on the porch. Although the lights were on inside the house, no one responded "for quite some time" to Soulsby's knock at the door.

After attempting to contact the police dispatcher for more information, Officer Soulsby rang the doorbell. Appellant White answered the doorbell, opening the door just enough to reveal his face and part of the right side of his body. Officer Soulsby explained that someone had reported shots fired inside the house, and asked if anyone was there with White, who replied, "No." Soulsby noticed a strong odor of marijuana. During this exchange, Officer Carroll joined his partner on the porch. He also noticed the strong marijuana odor. Aware that the suspects in the earlier murders were Jamaican males, the officers were concerned when they observed that White had his hair in dreadlocks, a style commonly associated with Jamaicans.

**2.** Officer Carroll testified that the dispatch had directed them to "the rear of" the residence. Officer Soulsby understood the dispatch to have directed them inside the residence. Although Officer Soulsby testified that he believed another police officer, Officer Langley, had responded to the rear of the residence, Officer Carroll testified that he believed that, because the houses in the block where 1213 Park Road is situated were attached, one could not gain access to the rear of any house without going through the front of one of them.

The officers also were anxious about the possibility that there were victims inside the residence who might need assistance. Officer Soulsby noticed that White appeared to be very nervous and was looking behind the door and making furtive movements with his left hand, which was concealed behind the door. The officer repeatedly asked White to bring his hand "out from behind the door." When he refused to show the officer his left hand, both officers were afraid that White was armed.

White attempted to close the door, but Officer Soulsby's left foot and left hand were caught between the door and the door frame. White pushed on the door from the inside while both police officers pushed from the outside in an effort to free Soulsby's foot and hand. Pushing on the door until they overcame White's resistance, the officers gained entry. While Officer Carroll held the struggling White against the wall in the foyer, attempting to frisk him for weapons, Officer Soulsby picked up a large, hand-rolled, still-smoldering marijuana "cigar" which he had seen White drop onto the floor. A third officer, Reginald Williams, entered to assist Carroll in controlling White while Soulsby began walking toward the rear of the house, looking for possible victims of a shooting.

Seeing a woman sitting on the couch in the living room, Officer Soulsby commented to White, "I thought you said no one else was in the house." Soulsby checked to make sure that no one else was in the living room and that the young woman was not armed. Officer Williams followed Officer Soulsby as he checked the first floor, searching through the dining room and into the kitchen for victims or for someone who might be armed. Hearing the footsteps of one or more persons in the basement, Officer Soulsby again was afraid that someone in the house might be armed or that the noise he heard downstairs might have come from someone who was injured. He walked carefully through the doorway, which was open, and down the stairs with his gun drawn. There were two rooms at the bottom of the stairs, one to the left and one to the right. Soulsby looked around the open doorway in the room to his right ("Room 1") to make sure that no one was hiding behind the door. Although no one appeared to be in the room, Soulsby saw a table piled with packaging materials, packages of crack cocaine, other drugs, and drug paraphernalia. Officer Soulsby did not enter Room 1 at that moment but instead called loudly for Officer Williams' assistance.

Soulsby, followed by Williams, entered the bedroom to the left ("Room 2") where they encountered appellant Earle lying face down on the bed with his arms outstretched. The light was on in Room 2 and Earle was fully dressed, including shoes and socks. Soulsby at first thought that Earle might be sleeping, but when the officers "woke him up" Earle did not appear to be startled to see them there with a weapon drawn. Together the two officers got Earle off the bed and frisked him for weapons. Earle told the officers that his name was Huntley Forbes. They took him to Room 1, where Officer Soulsby had seen the crack cocaine. Soulsby then returned to Room 2 and checked the closet. Finding no one there, he returned to Room 1, calling to Officer Carroll to bring White and the woman downstairs as a safety precaution to allow the officers to monitor everyone present.

As they were assembled, hearing a noise in what appeared to be a small closet in Room 1, Officer Williams used a pin to unlock the door to what was actually a small bathroom where codefendant Lattival McKenzie was sitting in the dark on the closed lid of the toilet, fully dressed, wearing headphones and a portable radio. Officers Carroll and Williams brought McKenzie out of the bathroom into Room 1 with the others. Carroll frisked McKenzie and found fifteen empty "ziplock" bags in the front pocket of his jumpsuit, along with a wallet containing $1,224 in cash.

Examining the table in Room 1, the officers found loose rocks of crack cocaine, a razor blade, two large "ziplock" bags of individually wrapped rocks of crack cocaine, six bags of marijuana, a small scale, a knife, cigarette rolling papers, a cigarette

lighter, a supply of empty "ziplock" bags, a cigar box containing a ten dollar bill and some change, a small police scanner radio, two "beepers" or radio pagers, and a set of nunchucks (a martial arts weapon). After field tests proved that the substances were cocaine and marijuana, the officers catalogued the evidence.[3]

## II. THE FOURTH AMENDMENT.

### A.

" '[S]earches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *United States v. Booth*, 455 A.2d 1351, 1354 (D.C. 1983) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (quotation omitted); *accord Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). One such exception is "exigent circumstances," where "the dangers are such that entry cannot be delayed." *Id.* at 1354; *see United States v. Minick*, 455 A.2d 874, 877 (D.C.) (en banc), *cert. denied*, 464 U.S. 831, 104 S.Ct. 111, 78 L.Ed.2d 112 (1983) (hot pursuit of suspected armed felon); *see also Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967).

We have recognized, as a subset of this exception, an "emergency" exception to the warrant requirement. *See Booth*, 455 A.2d at 1355. The emergency exception acknowledges the right and duty of the police to respond to emergency situations, " 'recogniz[ing] that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.' " *Id.* (quoting *Mincey*, 437 U.S. at 392, 98 S.Ct. at 2413).

In *Booth*, a police officer received a radio report of an "assault in progress." He drove to the reported address and knocked on the front door. When appellant answered the door with dried blood on his nose, the officer, having "reason to believe that somebody in there had been injured," crossed the threshold of the front door into the hallway of the rooming house. Eventually he encountered the complainant, his face covered with blood. *Id.* at 1352. One of appellant's codefendants told the officer that she had struck the complainant with a broom handle, which the officer then seized. The trial court suppressed the statement and the broom handle as fruits of an illegal entry. *Booth*, 455 A.2d at 1353. We held that the trial court erred when it failed to consider the emergency exception to the warrant requirement in determining whether the officer had been justified in crossing the threshold of the rooming house. *Id.* at 1355–56.

Three criteria must be satisfied to justify a warrantless entry under the emergency exception. (1) The police officer must have probable cause based on specific, articulable facts to believe that an immediate entry is necessary to assist someone in danger of bodily harm; (2) the entry must be carefully tailored to achieve that objective; and (3) the entry must be motivated by an intent to investigate a genuine emergency and to render assistance, not by the intent to arrest or to search. *Id.*

We conclude that these three criteria were met in this case. There was the required probable cause. The officers had been summoned to the home because of a report that shots had been fired in or at the rear of the house—a strong implication of imminent danger of bodily harm. Officer Soulsby stood on the porch for "quite some time" waiting for someone to answer the door. When White did respond he behaved

---

3. A Drug Enforcement Agency report identified the seized substances as follows: (1) 17,739 milligrams of marijuana in five plastic bags; (2) 26,354 milligrams of marijuana in one plastic bag; (3) 1,951 milligrams of 86% pure crack cocaine in ten plastic packets; (4) 1,233 milligrams of 96% pure crack cocaine in one plastic bag; (5) 4,916 milligrams of 87% pure crack cocaine in four plastic packets; (6) 13,509 milligrams of 90% pure crack cocaine in 100 plastic packets; (7) 14,218 milligrams of 88% pure crack cocaine in 100 plastic packets; and (9) 933 milligrams of marijuana rolled in paper.

nervously, looked repeatedly back behind the door, and refused to show his hands. He resembled the suspects in the earlier homicides nearby. He tried to shut the door on Soulsby. Given these circumstances, the police had reason to be concerned for the safety of possible victims inside.

The second *Booth* requirement is also met. Although the entry must be carefully tailored to achieve only the objective of assisting someone in danger, the scope of the objective, and thus of the entry, coincided in this case with the duty to ascertain whether someone on the premises had been injured by a gun. The officers here did "no more than [was] reasonably necessary to ascertain whether someone [was] in need of assistance." *Id.* Finally, because both officers testified repeatedly that their central concern was the possible presence of injured victims in the house, the record supported a finding that the entry was motivated by an intent to investigate and respond to a genuine emergency, not to arrest or to search. Accordingly, we sustain the trial court's ruling that the requirements of the emergency exception were met and thus that the police officers lawfully entered White's home.

■ Once legally inside, the officers observed, in plain view, the large smoldering marijuana "cigar" that White dropped at his feet. The officers, therefore, were justified under the plain view doctrine in arresting White and seizing the cigar. *See Texas v. Brown,* 460 U.S. 730, 738, and n. 4, 741–742, 103 S.Ct. 1535, 1541 and n. 4, 1543, 75 L.Ed.2d 502 (1983) (plurality opinion); *cited with approval in Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983) (plain view doctrine authorizes seizure of illegal or evidentiary items visible to police whose access to object had Fourth Amendment justification and who had probable cause to

suspect that object was connected with criminal activity).

### B.

■ In this case, the officers' right to enter and investigate the premises under the emergency exception coincided with their right to conduct a "protective sweep" of those areas that they reasonably believed might "harbor[ ] an individual posing a danger." *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 1095, 108 L.Ed.2d 276 (1990). "A protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id.* The police officers here had responded to a report of gunfire at White's home. Officer Soulsby, with Officer Williams close behind, conducted a protective sweep of the first floor of the home not only to find out whether victims were in need of aid but also to learn whether anyone else was present and posed a danger to the officers or to others. The officers certainly were justified in looking "in closets and other spaces immediately adjoining the place of [White's] arrest from which an immediate attack could be launched." *Buie,* 494 U.S. at 334, 110 S.Ct. at 1098. In addition, on this record they were justified in conducting a search of those areas where a victim or someone involved in a shooting might be found. *See Douglas–Bey v. United States,* 490 A.2d 1137, 1138 (D.C.1985).[4]

■ While in the kitchen on the first floor, Officer Soulsby heard what sounded like footsteps in the basement below. White had told him that there was no one else in the house, but White's statement had already been proved false by the presence of the young woman on the couch. The noises in the basement, combined with White's false statements and the report of gunfire, accordingly provided the officers with "articulable facts which, taken together with the rational inferences from those

---

4. Although in *Douglas–Bey* we reversed the trial court's denial of appellant's motion to suppress the fruits of a search conducted by a crime scene search officer, we acknowledged (and the appellant conceded) that the initial entry by the first officer on the scene, who was answering a police broadcast reporting a shooting, and who conducted a search limited to "those areas where he reasonably could expect to find" a victim or someone involved in the shooting, was valid under the emergency exception. *See Douglas-Bey,* 490 A.2d at 1138.

facts, would warrant a reasonably prudent officer in believing that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334, 110 S.Ct. at 1098.

The Court's ruling in *Buie* is narrowly limited to *protective* sweeps, *i.e.*, sweeps where police officers "have a reasonable basis for believing that their search will reduce the danger of harm to themselves or of violent interference with their mission." *Id.* at 337, 110 S.Ct. at 1100 (Stevens, J., concurring). Here, Officer Soulsby descended the basement stairs after only hearing footsteps in a place where White had told him no one was present and in response to a report of gunfire. We conclude that, because Soulsby did so with a reasonable suspicion of danger lurking there, he was lawfully in the basement when he discovered the drugs and paraphernalia, in plain view, piled on the table in Room 1. We therefore agree with the trial court that this evidence was lawfully seized. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467–68, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971).

### III. DENIAL OF APPELLANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL.

#### A.

White maintains that the basement area was a separate dwelling unit, with a separate entrance, inhabited by a tenant who paid rent to White's mother, who owned the house.[5] Thus, White says, he had no access to the drugs found in the basement apartment. He argues that without something to connect him with the drugs and thereby establish his constructive possession, the evidence was "such that a reasonable juror *must* have a reasonable doubt" as to the existence of an essential element of the crime. *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987) (emphasis in original).

Earle also argues that the government's evidence was insufficient for the jury to

convict him on any of the three charges; like White, he contends that the government failed to prove that he constructively possessed the drugs seized.

■ In reviewing appellants' claims, we must view all the evidence in the light most favorable to the government and give deference to the right of the jury to weigh the evidence, determine the credibility of the witnesses, and draw all justifiable inferences of fact, making no distinction between direct and circumstantial evidence. *See id.* at 263; *In re L.A.V.*, 578 A.2d 708, 710 (D.C.1990); *McAdoo v. United States*, 515 A.2d 412, 427 (D.C.1986). When a defendant testifies on his or her own behalf, this court considers the entire record, not merely the government's evidence, in determining the sufficiency of the proof. *See Mills v. United States*, 599 A.2d 775, 780 (D.C. 1991). The testifying defendant "runs the risk that his case will incidentally fill in the gaps left in the government's case." *Dumas v. United States*, 483 A.2d 301, 304 (D.C.1984); *accord United States v. Foster*, 251 U.S.App.D.C. 267, 270, 783 F.2d 1082, 1085 (1986).

■ To establish constructive possession, the government must prove that the accused (1) knew the location of the drugs, (2) had the ability to exercise dominion and control over them, and (3) intended to exercise such dominion and control. *See Burnette v. United States*, 600 A.2d 1082, 1083 (D.C.1991); *Speight v. United States*, 599 A.2d 794, 796 (D.C.1991); *In re T.M.*, 577 A.2d 1149, 1151 n. 5 (D.C.1990); *see also Brown v. United States*, 546 A.2d 390, 394 n. 2 (D.C.1988) (quoting standard jury instruction). Constructive possession may be established by circumstantial as well as direct evidence, *e.g.*, *Bernard v. United States*, 575 A.2d 1191, 1195 (D.C.1990), and may be sole or joint possession. *Id.* (quoting *Brown*, 546 A.2d at 394 n. 2). If the accused is found near the drugs, this may establish a prima facie case of constructive possession if there also is evidence linking the accused to an ongoing criminal opera-

---

5. White raised this argument for the first time at trial. To have raised it at the suppression hearing would have jeopardized his standing to

challenge the legality of the search and seizure in the basement.

tion of which the possession is a part. *See Speight*, 599 A.2d at 797; *In re T.M.*, 577 A.2d at 1153; *Curry*, 520 A.2d at 263 (citing *United States v. Hubbard*, 429 A.2d 1334, 1338 (D.C.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981)); *Wells v. United States*, 515 A.2d 1108, 1113 (D.C.1986).

## B.

■■■■ The government's evidence showed that there was nothing separating the basement where the drugs were found from the rest of White's residence except a stairway and two doors, both of which were open at the time of the incident.[6] White was smoking a marijuana cigar when the police arrived; the only other marijuana and rolling papers in the house were found downstairs in Room 1, on the table with other illegal drugs and paraphernalia. White, moreover, in denying anyone else was in the house, lied twice: once at the front door when the police arrived and again after the police discovered the young woman in the living room. This evidence was enough to support inferences that White knew about the drugs in his basement and had the ability, as well as the intent, to exercise dominion and control over them. Thus, the evidence was sufficient to support White's conviction for constructive possession of the drugs downstairs.

## C.

Earle presents a closer case. The police discovered Earle in basement Room 2 lying face down on a bed with his arms outstretched, fully dressed, wearing shoes and socks, with the lights on, only a few feet away from Room 1, where in plain view there was a huge quantity of crack cocaine and marijuana with a street value in the thousands of dollars, along with paraphernalia associated with the illicit drug trade. Earle claimed to have fallen asleep while visiting his friend "Tony," who, he said, lived in White's basement apartment. The question, then, is whether the jury could

reasonably infer that Earle had knowledge of the drugs, coupled with intent and ability to exercise dominion and control over them, such as would warrant a finding of constructive possession.

Recently, in *Speight*, we reversed a conviction of possession with intent to distribute cocaine for lack of a reasonable inference of constructive possession, even though the appellant was in the same room where the illicit drugs and related paraphernalia were found. We said that the jury reasonably could have found that the appellant knew about the drugs on the couch only six feet away and that, because they were so close to him, he had the ability to exercise dominion and control over them. *See Speight*, 599 A.2d at 796. We concluded, however, that the government's proof fell short of establishing an intention to exercise such dominion and control. We noted that no evidence linked Speight to the drugs other than his proximity to them. Of the five individuals in the apartment, others were closer to the drugs than Speight. Moreover, there was no evidence that Speight lived in the apartment. No belongings of his were found there, and there was no testimony about how long he had been there. We added that the fully furnished apartment appeared to be the tenant's residence; nothing suggested it was used primarily for illicit drug activity. We concluded that "the clear import of the evidence presented was that appellant was nothing more than a visitor in someone else's home." *Id.* We stressed that although Speight gave a false name to the police, a factor which carries some weight in evaluating whether one was involved in criminal activity, *see Wheeler v. United States*, 494 A.2d 170, 173 (D.C.1985), that falsehood was not enough, coupled with Speight's proximity to the drugs, to warrant a finding of constructive possession. *See Speight*, 599 A.2d at 798. Similarly, in *T.M.*, we declined to find constructive possession of a gun when: the appellants were two of six persons roughly equidistant

---

**6.** This evidence contradicted White's testimony that the door to the basement was always padlocked and that he only went to the basement in order to wash his clothes, which he had not done in nearly a month.

from the gun in "a sordid crack house," 577 A.2d at 1154; the appellants were acquitted of drug charges, and there was no evidence that either of them "had any personal role" in the handling or distribution of cocaine; and there was no evidence that either appellant "had any prior association with the other persons in the apartment." *Id.* at 1153.

In the present case, Earle was found not in a room with the drugs but in another room several steps away; thus, though closer to the drugs than White at the time, Earle was farther away than the appellants had been in *Speight* or *T.M.* The facts the jury heard here, however, create a different impression from the "mere visitor" image presented in *Speight* and in *T.M.*

█ We begin by returning to the evidence of the police officers' "awakening" Earle in Room 2. White had engaged in a noisy struggle with police upstairs after a delayed response to their knock at his door. Then, before Officer Soulsby descended the stairs,—*i.e.*, during the period when he was executing a protective sweep of White's home—Soulsby heard the sound of footsteps in the basement, indicating that one or more persons were moving around there. Moreover, only seconds before encountering Earle, Officer Soulsby, while standing outside the door of Room 2, had called loudly upstairs to Officer Williams for assistance.[7] Officers Soulsby and Williams both testified that Earle did not appear to be startled or disoriented when they "awakened" him in Room 2. Under these circumstances, we believe the jury could reasonably have inferred that Earle had been feigning sleep, after hearing activity upstairs that suggested the police had arrived[8] and then rushing to position himself away from drugs and paraphernalia in plain view.

Furthermore, the jury heard not only Earle's testimony but also McKenzie's and White's. Because this was a joint trial, and no severance issue is presented, we must view the evidence as the jury did with whatever inferences of guilt can reasonably and fairly be drawn from all the testimony taken together. The jury heard each of these defendants give testimony that not only was inconsistent with the testimony of police witnesses but also contradicted or otherwise tended to undermine the testimony of one another. "It is a first principle that the jury, as finder of fact, has the function of determining the credibility of witnesses." *Morrison v. United States*, 417 A.2d 409, 413 (D.C.1980). And, as always in a trial by jury, "conflicts in evidence are reserved for jury resolution." *Streater v. United States*, 478 A.2d 1055, 1058 n. 4 (D.C.1984).

Earle testified that he knew White, who lived upstairs. Earle and McKenzie both testified that they knew "Tony"—their alleged host in White's basement apartment—because they played soccer with him at Malcolm X Park, but Earle and McKenzie did not know one another. Nor, according to their testimony, had they ever seen one another before the night they were arrested in "Tony's" apartment, even though each played soccer with "Tony." Earle and White had known each other for six years because they played soccer together, but White testified he knew neither McKenzie nor "Tony," who, according to Earle and McKenzie, lived in White's own basement.[9] Neither Earle nor McKenzie ever saw the other in "Tony's" apartment in White's basement that night, according to their testimony, even though they were apparently there at the same time—and even though "Tony" got each of them a beer, "Tony" talked with McKenzie in the hallway, and "Tony" talked with Earle in

---

7. Soulsby shouted loudly enough to be heard by Officer Carroll, who was still standing with White in the front hallway.

8. Officer Soulsby did not go toward the kitchen and the back of the house until after the police "wagon crew" came inside the house to assist Officer Carroll with Owen White. The arrival of more police officers, following the struggle to

subdue White, would certainly have added to the noise upstairs. The jury reasonably could have inferred that Earle and McKenzie knew the police had arrived.

9. Although White said he did not know "Tony," Earle testified that "Tony" had lived in White's basement nearly a year.

the bedroom. According to both Earle and McKenzie, "Tony" left the house saying that he would be back in a short while, explaining to McKenzie that he was going to the store for more beer. "Tony" himself did not testify.[10]

McKenzie also testified that he had gone to the bathroom just two minutes after "Tony" had left. McKenzie said he then heard a knock at the bathroom door and was confronted by the police only a minute and a half or so after he had entered the bathroom, having heard no activity in Room 1—or upstairs—in the meantime. According to the government's evidence, however, Officer Soulsby shouted to Officer Williams from the same hallway where McKenzie was supposedly standing at the same time. The two officers then encountered Earle in Room 2. Williams testified that he and Soulsby spent between 5 and 12 minutes there with Earle[11] before the officers took him across the hall to Room 1 and another officer brought White and his female companion downstairs to Room 1. According to the officers' testimony, only after everyone else was gathered in Room 1 did the officers discover McKenzie in the bathroom there.

This court has recognized that a defendant's "falsehood" or "fabrication" of evidence in the presentation of the defense case

> is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.*

*Mills*, 599 A.2d at 783–84 (quoting II J. WIGMORE, EVIDENCE § 278, at 133 (Chad-

bourne ed. 1979)) (emphasis in *Mills*); *see Fox v. United States*, 421 A.2d 9, 13 (D.C. 1980). In *Mills*, we emphasized that, "[i]n some cases, the ultimate inference that is drawn from a person's self-serving lies is that he or she 'did it.' " *Mills*, 599 A.2d at 783. The jurors, faced with the morass of contradictory testimony by Earle, White, McKenzie, and the police officers, were free to believe Officers Soulsby and Williams and to disbelieve Earle and his codefendants in finding the facts. *See Brenke v. United States*, 78 A.2d 677, 678 (D.C.1951) ("where there is a direct conflict between the testimony of a defendant and that of a witness for the government, the trier of the facts has a right to accept the version of the government's witness").

 More specifically, the jury reasonably could have inferred from the defendants' own testimony that the conflicting stories about "Tony" and the respective comings and goings in a relatively small area—reminiscent of scenes from the Keystone Cops—were inherently contradictory and far-fetched, especially when contrasted with the police witnesses' testimony. This reasonable rejection of the defense stories—including disbelief of Earle under these circumstances—could supply a powerful, reasonable inference that Earle was involved in a concerted illegal drug operation in the basement near where he was apparently feigning sleep. *See Mills*, 599 A.2d at 783. *See also United States v. Tyler*, 758 F.2d 66, 69 (2d Cir.1985) ("defendant's incredible story was another circumstance the jury was entitled to consider" in reaching its verdict); *United States v. Cotton*, 770 F.2d 940, 945 (11th Cir.1985) (jury free to disbelieve defendants' story that although they had been apprehended unloading duffle bags full of cocaine, they had been hired to unload—and believed that they were unloading—"Guatemalian relief supplies"); *United States v. Kenny*,

---

**10.** Although no "missing witness" inference was argued, the jury was free to disbelieve the "Tony" stories as exceedingly improbable. *Cf. United States v. Pitts*, 286 U.S.App.D.C. 392, 394, 918 F.2d 197, 199 (1990) (some persons "potentially have so much to offer that one would expect them to take the stand" and jury may

make negative inference from their failure to do so).

**11.** Earle testified that the officers spent between five and seven minutes with him in Room 2 before taking him across the hall to Room 1.

645 F.2d 1323, 1346 (9th Cir.1981) (trier of fact, hearing testimony from government witnesses and multiple defendants, may conclude from its disbelief of defendant that the opposite of defendant's testimony is the truth); *Seeman v. United States*, 96 F.2d 732, 733 (5th Cir.) (jury may infer consciousness of guilt from false statements of accused attempting to explain proven facts), *cert. denied*, 305 U.S. 620, 59 S.Ct. 80, 83 L.Ed. 396 (1938). Nothing like the bundle of questionable and conflicting stories the jury heard here was presented in *Speight* or in *T.M.*

█ There are other differences from *Speight* and *T.M.* Earle and White testified that they knew each other. In contrast, there was no evidence in *Speight* or in *T.M.* showing that the appellants had any prior association with the other individuals present. *See Speight*, 599 A.2d at 797; *In re T.M.*, 577 A.2d at 1153. Earle also admitted that he had given a false name to the police.[12] As we have noted, a false response to police can support an inference of consciousness of guilt, *see Speight*, 599 A.2d at 797; *Wheeler*, 494 A.2d at 173; *Van Ness v. United States*, 568 A.2d 1079, 1083 (D.C.1990), which may indicate an effort to conceal a "concert of illegal action." *Curry*, 520 A.2d at 264. According to *Speight*, that false response in itself would not be a factor conclusive of guilt, but it does carry some weight when combined with other evidence tending to show guilt.

Speight, moreover, had made no effort to separate himself from the contraband, whereas the jury here was entitled to infer

that Earle feigned sleep to avoid any implication that he was associated with the huge drug distribution enterprise in the next room. Also, the jury reasonably could have inferred that White was attempting to conceal Earle's (and McKenzie's) presence when White twice told the police that no one was with him in the house. The jury reasonably could have inferred that White's delay in answering the door was an effort to give Earle and McKenzie more time to secrete themselves. Finally, the jury reasonably could have inferred that, since the police could hear movement downstairs, the persons downstairs could as easily hear the scuffle between White and the officers, followed by the police movements in conducting the protective sweep of the upstairs. Earle's apparent attempt to separate himself from the drugs, when he heard the noise upstairs that was identifiable as police activity, *see supra* note 8, was unlike that of the juvenile defendants in *In re T.M.*, who openly "attempt[ed] to scurry under clothes and blankets when *unknown persons* had just noisily broken down the door with a battering ram." *In re T.M.*, 577 A.2d at 1153 (emphasis added). We believe Earle's apparent maneuver—separating himself from the contraband by feigning sleep in a nearby room once he knew the police were searching upstairs—is better compared with the situation in *Thompson v. United States*, 567 A.2d 907 (D.C.1989), where the defendant's "surreptitious conduct in secreting himself behind the partition ... [was] evidence tending to show criminal activity on his part." *Id.* at 909.[13]

---

**12.** Earle testified that he gave the false name because he did not want his girlfriend's family to find out that he had been arrested.

**13.** Judge Mack in dissent relies heavily on the plausibility of Earle's explanation for his presence at the residence: that, after fighting with his girlfriend, he had gone for a walk, and that when it began to rain, Earle went to visit his friend "Tony"—whose last name he did not know and whom he had never visited before—although he did so after eleven o'clock that evening. Our dissenting colleague is also persuaded by Earle's explanation for his overwhelming sleepiness, namely that he had consumed two "tiny" beers before leaving his home and that, while visiting "Tony," his host had

momentarily gone out of the bedroom where Earle was visiting and had brought him back a third beer before departing. We note that the jury heard Earle's testimony and was in a better position than we are to determine the credibility of this story. *See United States v. Goggin*, 853 F.2d 843, 846 (11th Cir.1988) (when presented with government's narrative and with second plausible explanation consistent with innocence, jury is entitled to choose account offered by government and to reject defendant's innocent explanation as complete fabrication); *United States v. Hermes*, 847 F.2d 493, 495 (8th Cir. 1988) (jury entitled to disbelieve defendant's story); *United States v. Elledge*, 723 F.2d 864, 869 (11th Cir.1984) (jury may choose to disbelieve defendant's testimony even if uncontradicted).

■ The drugs and paraphernalia seized were packaged in a manner consistent with distribution. Much of the cocaine was packaged in ziplock bags, in amounts regularly sold and purchased on the street. The marijuana, found in combination with crack cocaine and paraphernalia, was ready for distribution. The items of paraphernalia were those associated with preparation and sale of illegal drugs. This evidence was sufficient for the jury to infer the intent to distribute.[14]

In this case, "the evidence [was] such that a reasonable mind might or might not have a reasonable doubt as to the guilt of the accused." *Curry*, 520 A.2d at 263. In such circumstances, we have explicitly held that a motion for judgment of acquittal should not be granted. *Id.* (citing *Crawford v. United States*, 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967)). The trial court did not err in allowing this case to proceed to the jury. And, the evidence was such that a reasonable jury could find that Earle, as well as White, constructively possessed the illegal drugs and paraphernalia (through knowledge of the drugs and intent and ability to exercise control over them) and that they had the intent to distribute the drugs.

### IV. THE AIDING AND ABETTING INSTRUCTION.

■ White argues that the trial court erred in giving the instruction on aiding and abetting because the government failed to prove that appellant had participated in the criminal drug operation in his basement. It is well established, however, that presence may constitute aiding and abetting if it designedly encourages or facilitates the criminal activity. *See Settles v. United States*, 522 A.2d 348, 358–59 (D.C.1987); *Creek v. United States*, 324 A.2d 688, 689–90 (D.C.1974). The illegal drug operation was conducted in plain view in White's own house. White was smoking a hand-rolled marijuana cigar and the only other marijuana and rolling papers in the house were found on the table in Room 1. The jury was justified in drawing the inference that White knew the drug operation was there, that he was connected with it, and that he facilitated the illegal activity by allowing it to be conducted in his home. The trial court accordingly did not err in instructing the jury on aiding and abetting.

### V. WHITE'S PRIOR CONVICTIONS.

■ Finally, we turn to White's contention that the prosecutor improperly emphasized White's prior convictions in his rebuttal argument to the jury,[15] at a time when defense counsel was foreclosed from making a corrective response. White contends the prosecutor argued a fact not in evidence because White did not admit on the stand his 1982 conviction on the weapons charge and the government was unable to

---

**14.** In *United States v. Batista–Polanco*, 927 F.2d 14 (1st Cir.1991), the appellant argued that his "mere presence" was insufficient to support his conviction in a drug conspiracy. The court said:

> Appellant admitted that he remained for at least forty-five minutes in an apartment strewn with evidence of a large-scale heroin packaging operation. In these circumstances we cannot accept the hypothesis that participants in a distribution scheme would permit a noncontributing interloper to remain for an extended period of time in a small apartment while their conspicuous criminal conduct continued unabated. "[S]uch is not normally the conduct one would expect of conspirators engaged in conduct which by its nature is kept secret from outsiders."

*Id.* at 18 (citing *United States v. Smith*, 680 F.2d 255, 260 (1st Cir.1982); *United States v. Staten*, 189 U.S.App.D.C. 100, 107, 581 F.2d 878, 885 (1978) (presence in small apartment replete with indicia of ongoing drug distribution enterprise "could rationally have been viewed as a privilege reserved exclusively for participants")).

**15.** White challenges the following portion of the prosecutor's closing statement:

> But what you can do, and the Court will instruct you that you can consider, to determine whether he was believable, to determine whether he was credible. The fact that he was convicted in 1980, that he was convicted in 1982 of possession of a prohibited weapon, that he was convicted in two counts of assault with a deadly weapon in 1985. That he was convicted of possession of marijuana in '84, and that he was convicted of carrying a deadly weapon in 1984. You can consider that to determine whether you want to believe Mr. White's story.

refresh his recollection with a certified copy of his conviction record.[16] White also maintains that the prosecutor unfavorably compared him with the police officer witnesses.

Because defense counsel failed to object at trial, we will not reverse absent error so prejudicial that " 'the very fairness and integrity of [the] trial' [are] jeopardized." *Coreas v. United States*, 565 A.2d 594, 600 (D.C.1989) (quoting *Lewis v. United States*, 541 A.2d 145, 146 (D.C.1988)). We cannot see how White was prejudiced by inclusion of his 1982 conviction in the prosecutor's "laundry list" of prior convictions, such that the very fairness and integrity of the trial were jeopardized. In assessing prejudice to White, we balance the gravity of any impropriety against its direct relationship to the issue of his guilt, the effect of any curative instructions, and the strength of the government's case. *See Irick v. United States*, 565 A.2d 26, 32 (D.C.1989). Here the jury had already heard about the existence of White's lengthy list of criminal convictions during his cross-examination.[17]

Immediately after White was impeached with his convictions, the trial court properly instructed the jury:

> Ladies and gentlemen, a defendant's prior criminal convictions are admitted into evidence solely for your consideration in evaluating his credibility before you here as a witness. Now, the prior convictions are not evidence of the defendant's guilt of the offenses with which he is charged in this case, and you must not draw any inference of guilt against the defendant because of his prior convictions. You may consider the prior convictions only in connection with your evaluation of the credence to be given his testimony before you here in court.

In the government's rebuttal, the prosecutor was careful not to imply that White's prior convictions were in any way relevant to the issue of his guilt. Following the rebuttal, the court again gave a curative instruction warning the jury that prior criminal convictions may be considered only in evaluating the credibility of a witness. The trial court minimized any prejudice from a comparison of White to police officer witnesses with the following instruction:

> [Y]ou should understand that a police officer's testimony should be considered by you just as any other evidence in the case. And in evaluating the credibility or believability of any police officer witness, you should use the same guidelines that apply to the testimony of any other witness. In no event should you give either greater or lesser credence to the testimony of any witness simply because that witness was a police officer.

Given the extreme care with which the trial court instructed the jury on weighing the credibility of witnesses and the proper effect of impeachment, the lack of any association of White's previous convictions with the issue of his guilt, and the strength of the government's case, we perceive no prejudice to White resulting from the prosecutor's reference to his prior convictions.

*Affirmed.*

MACK, Senior Judge, concurring in part, dissenting in part.

I respectfully dissent from the court's finding affirming the conviction of appellant Earle.

In my view, the government has not proved, either through direct evidence or circumstantial evidence, that Earle had constructive possession of drugs. At the appellate level, our majority, in an elaborate and imaginative creation of inferences, has itself fallen into the classic trap of "casting

---

16. Although it was not introduced in evidence, a certified copy of White's conviction record was marked for identification as Government's Exhibit No. 15. White did not deny his 1982 conviction on a weapons charge but testified that he did not remember it.

17. We have indicated that the manner in which previous convictions are revealed, if it reduces the prejudicial impact of the prosecutor's erroneous use of them, should be considered in the harmless error or plain error analysis. *See Dorman v. United States*, 491 A.2d 455, 463 n. 10 (D.C.1984) (en banc).

too wide a net."[1] *See Wheeler v. United States*, 494 A.2d 170, 173 (D.C.1985).

Here, we are not at odds as to the applicable law, either with respect to the constitutional burden of the government to prove every element of the criminal offense beyond a reasonable doubt or the standard which the trial court, or this court, must apply in determining the legal sufficiency of the evidence to go to the jury or to support conviction. Likewise the basic facts we are reviewing are not disputed. In fact, the government produced direct evidence that Earle was found in the Park Road, N.W. house at the time of the police raid, that he gave his residence as being an address on Fort Totten Drive, N.E., that no money, no drugs, no weapons were found on his person, and, that nothing at all was found on the premises that would suggest that he lived there. Indeed, the arresting officer conceded that the arrest was predicated upon the fact that Earle happened to be in the house and that drugs were found there. Since the fact of mere proximity to drugs is obviously insufficient to convict one of a drug offense, it is the theory of constructive possession that the government concededly embraced in its effort to convict Earle.

In order to meet the burden of establishing constructive possession, the government was obliged to present evidence from which a reasonable mind could conclude beyond a reasonable doubt that Earle knew of the presence of the drugs and had both the power and intention to exercise dominion and control over the drugs. *See Wheeler, supra*, 494 A.2d at 172; *Curry v. United States*, 520 A.2d 255, 264–65 (D.C.1987). This it did not do. The issue here is one of failure of proof—not the credibility of the accused. [Majority, note 13]

The majority relies on the fact, undisputed, that Earle was found in a sleeping posture on a bed in Room 2 of the basement, fully dressed with the lights on—a room opening to the same basement corridor as Room 1, another room where a huge quantity of drugs were found.[2] The majority tells us that the doors to both rooms were open. It does not tell us further what government witnesses confirmed—that the drugs were on a table behind the door opening into Room 1, that there was no information whatsoever to show that Earle was ever in Room 1 prior to his being taken there after arrest, and that the rooms were positioned in such a way that it was possible to enter Room 2 from a hallway door (leading to an alley) without having seen what was hidden behind the opened door in Room 1. Earle testified that he was asleep and that he had not entered Room 1 before he was taken there after his arrest. Moreover, government counsel in arguing against a motion for judgment of acquittal, conceded that Earle could not have seen the drugs from the location where he was found. Thus, the government did not prove that the drugs were in "plain view" of Earle. The fact of "proximity" therefore, expressed in sole terms of distance, and negating the suggestion of view, tells us nothing as to knowledge, ability or intent and therefore nothing as to possession.

Similarly, the undisputed fact that a resident of the house, codefendant White, knew Earle, tells us nothing. White testified that he knew Earle because he had encountered him in a park where they played soccer. He had never seen him enter the house. The remaining codefendant found in the house, McKenzie, had never seen Earle before the arrest. Both of Earle's codefendants knew one "Tony," a non-probative fact as to Earle, but nevertheless used by the majority today in its convoluted account culling the testimony of the three defendants in an attempt to infer

1. Consider, for example, the suggestion that involvement in a criminal enterprise be attributed to a visitor in a residence because of delay on the part of someone else in answering the door. [Majority at 1269]

2. The majority uses the phrase "only a few feet away" (from the room where the drugs were found). Government counsel, in conceding the truth of evidence that the drugs could not be seen without entering Room 1, nevertheless speaks of Earle being within ten to fifteen feet of the drugs.

guilt on the part of Earle.[3] [Majority at 1267–1269] Earle testified that he had never been in the house before the night he impulsively stopped at the basement door where he had seen Tony (a fellow soccer player) previously enter and that he did not know that White lived upstairs. The government produced no evidence to the contrary.

Moreover, Earle gave a plausible account of his presence in the house the night of his arrest and it was corroborated to a great extent by his girlfriend. At twenty years old, working two jobs, living with the parents of the girlfriend (the young mother of his two year old son), exhausted, feeling trapped, and upset about an argument with his girlfriend, he walked out of their residence at Fort Totten Drive, N.E., into a pouring rain, crossed into Northwest by way of the Old Soldiers Home, and impulsively stopped at an alley door where he knew that "Tony" (a fellow soccer team player) lived and where he entered a room, was given beer and fell asleep. When he was awakened by a nightstick, drowsy and afraid, he saw two guns. When he realized he was facing the police, he gave a false name because he did not want his girlfriend's parents to hear of his dilemma.

Earle's testimony is plausible because it is consistent with the government's evidence. It is also consistent with innocence.

The majority attempts to bolster its position by relying upon a "consciousness-of-guilt" theory. Case law, with respect to the dominion and control aspects of constructive possession, has expressed it thusly: "[T]o prove constructive possession the government *also* must present some evidence connecting the accused 'to an ongoing criminal operation *of which the possession is a part.*' " *Wells v. United States,* 515 A.2d 1108, 1113 (D.C.1986) (emphasis supplied). Here the government proved no such connection, but more importantly, it proved no knowledge by Earle of possession by others. *Wheeler, supra,* 494 A.2d at at 171; *United States v. Hubbard,* 429 A.2d 1334, 1338 (D.C.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981). "[M]ere presence at the scene of the crime ... proximity to the drugs ... or [even] association with one in possession is not enough to allow a jury to find constructive possession." *Wells, supra,* 515 A.2d at 1113 (citing *Hubbard, supra,* 429 A.2d at 1338).[4]

Since the government proved no more than Earle's mere presence at the scene of the crime or, at most, a tenuous acquaintance with tenants at the scene, this case should not have gone to the jury on a consciousness-of-guilt theory. Even in cases where an accused is a resident of the premises, and others have access to the premises, courts will not normally impute possession of an illegal item without proof that the accused is actually involved in some criminal enterprise of which the contraband is a part. *Wheeler, supra,* 494 A.2d at 173; *Curry, supra,* 520 A.2d at 264.

The majority, relying on an inference of "feigned sleep," points to the officers' testimony that Earle was found in a sleeping

---

3. The majority, noting that no severance issue is presented, argues that the jury could have drawn inferences from the testimony of all three defendants in this joint trial. [Majority at 1267] First, let me repeat that the issue is not one of credibility but one of the failure of proof as to Earle. The majority is right, however, when it says no severance issue is presented. No severance issue is presented as to Earle because his defense was not inconsistent with the defenses of the codefendants and the testimony of the codefendants *was not* incriminating as to Earle. The majority is wrong when it creates, at the appellate level, a scenario of "Keystone Cops." [Majority at 1268] Even if the issue were one of credibility (and it is not) a jury would not have been free to use "the self-serving lies" of White and McKenzie to find fabrication on the part of Earle. [Majority at 1268–1269] That would be the ultimate in guilt by association.

4. There was no evidence that the drugs were in plain view of Earle, that he lived in the room or home where the contraband was found, that he attempted to conceal or destroy the contraband, or was observed making a transaction later found to involve narcotics, or exhibited some other consciousness-of-guilt, such as locking a door, not answering a door after the police identified themselves, or flight. *See Wells, supra,* 515 A.2d at 1113 (citing *inter alia Stewart v. United States,* 395 A.2d 3, 6 (D.C.1978)).

position, fully dressed in a lighted room after one officer had called loudly to a fellow officer. The fact of being fully dressed in such circumstances might or might not have some inferential value with respect to a resident but certainly less for a visitor—particularly a first-time visitor who had been drinking. I know of no case that suggests that being asleep under such circumstances would be so unusual as to imply consciousness of guilt of involvement in a criminal enterprise.[5] Moreover, the testimony of the officers that Earle, when awakened, did not appear to be startled, is not unequivocal. The first officer conceded that initially he had thought Earle was asleep and later that it was possible that Earle was asleep. The second officer, who testified that it was his "perception" that Earle was not asleep, could not identify Earle in the courtroom. As to the officers' perception, it hardly seems necessary to note that any individual's initial, physical reaction to a given set of startling circumstances (including noise) may well vary. Moreover, unlike the objective manifestations of flight, destruction of evidence, or concealment of identity, the question of whether one is startled, conscious or unconscious, is a subjective factor best known to the individual or a medical expert. In my view, the circumstances here do not support an inference of consciousness-of-guilt.

Finally, in the recently decided case of *Speight v. United States*, 599 A.2d 794 (D.C.1991) (which in my view cannot be distinguished on the facts),[6] we soundly rejected the concept that constructive possession of items found on premises could be imputed readily to a visitor who sought to conceal his identity at the time of arrest. We said there:

> There was nothing to show that appellant's real name connected him to the other individuals, to the apartment, or to the drugs. In the light of the absence of any other evidence connecting appellant to the criminal activity charged, his use of an alias coupled with his presence was insufficient to prove he was a prospective distributor of the drugs.... We conclude that no reasonable juror could find that appellant's role was as a participant in drug trafficking in light of other *plausible* reasons for his presence.

*Id.* at 798 (emphasis supplied). *See also In re T.M.*, 577 A.2d 1149 (D.C.1990).

We have recited a familiar litany again and again in reviewing the denial of a motion for judgment of acquittal:

> [W]e must review all the evidence in the light most favorable to the government and give deference to the right of the jury to weigh the evidence, determine the credibility of the witnesses and draw all justifiable inferences of fact, making no distinction between direct and circumstantial evidence.

[Majority at 1265]

In the onslaught of today's drug activity, a court, in favoring government evidence, may be prone to forget that "all the evidence" means not just the evidence presented by the government, but also that evidence presented by the accused. *See In re A.B.H.*, 343 A.2d 573, 575 (D.C.1975).

---

5. *No one*, regardless of heritage, education, moral values, social standing or economic wealth can go through life secure in the knowledge that he or she will only associate with the "pure in heart." In the criminal law arena, the loose approval of inferences that scream of "guilt by association" thus pose a danger to *everyone*. Unfortunately, it is people, who because of economic factors are apt, not only to be in the wrong place at the wrong time, but also less able to counter the validity of the inferences we draw.

6. I do not follow the majority's labored attempt to distinguish *Speight*. Did we reverse Speight's conviction because several other individuals had a "demonstrably closer connection with the drugs than Speight had?" If so, I would point out that in the instant case, McKenzie was found with drugs on his person and White was the owner-occupant of the premises—with demonstrably closer connections than Earle had.

Moreover, measured by known standards for proving constructive possession and the facts which were proved here, I am particularly troubled by the majority's use of such phrases as "[Earle's] *rushing* to position himself away from drugs and paraphernalia in plain view." [Majority at 1267] "Earle's *apparent* attempt to separate himself from the drugs *when he heard* the noise upstairs" [Majority at 1269], and "[Earle's] *prior association* with *other individuals present.*" [Majority at 1269] (Emphasis added.)

In my view, the government's evidence fell short of showing that Earle had knowledge of the presence of drugs or that he had the ability or intent to guide the destiny of the drugs. The inferences, *if any*, that could be drawn from the circumstances described by government witnesses were dissipated by Earle's plausible explanation, as well as the government's concessions. The trial court should have granted Earle's motions for judgment of acquittal. I would reverse his conviction.