John D. CARPENTER, Appellant,

v.

UNITED STATES, Appellee.

David C. JEFFERSON, Appellant,

v.

UNITED STATES, Appellee.

Jay BULLOCK, Appellant,

v.

UNITED STATES, Appellee.

Paul T. WRIGHT, Appellant,

v.

UNITED STATES, Appellee.

Nos. 82–1204, 82–1205, 82–1293 and 82–1518.

District of Columbia Court of Appeals.

Argued Jan. 12, 1984.

Decided March 21, 1984.

Florence King, Washington, D.C., appointed by the court, was on the brief for appellant Carpenter.

John K. Lunsford, Washington, D.C., for appellant Jefferson.

Kathryn Paull Brown, Washington, D.C., appointed by the court, was on the brief for appellant Bullock.

Betty J. Clark, Houston, Tex., appointed by the court, was on the brief for appellant Wright.

Sharon M. Collins, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Michael W. Farrell and Donald J. Allison, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before NEWMAN, Chief Judge, and FERREN and PRYOR, Associate Judges.

FERREN, Associate Judge:

Appellants' convictions resulted from police observation of a drug transaction at 14th and V Streets, N.W. A jury convicted appellant Jefferson of two counts, and the other appellants of one count each, of possession of heroin with intent to distribute. D.C.Code § 33–541(a)(1) (1983 Supp.).[1]

On appeal, Bullock, Carpenter and Jefferson argue that the evidence was insufficient to establish that the substance seized was a Schedule I narcotic. Appellant Carpenter also contends that the evidence was insufficient to show he constructively possessed the drugs, and that he was denied effective assistance of counsel. All four appellants urge reversal on grounds of prosecutorial misconduct during closing and rebuttal arguments. Bullock and Jefferson also argue that, because one of the jurors conversed with a witness, the court's denial of their motions for a new trial was an abuse of discretion. Wright and Jefferson challenge the use of a multiple-defendant jury form. Jefferson also argues that the cross-examination of appellants' co-defendant, Ernest Austin, was improper. None of these contentions has merit. We affirm.

## I.

On September 8, 1982, Metropolitan police officers Rufus Archer and Cora Clark stationed themselves on the fourth floor of a building near 14th and V Streets, N.W., to observe narcotics transactions in the area. From this vantage point, the officers

---

1. The trial court sentenced Jefferson to five to fifteen years' imprisonment on each count, to run concurrently; appellant Carpenter to two to six years' imprisonment with a recommendation of work release; appellant Bullock to three to nine years' imprisonment; and appellant Wright to three to twelve years' imprisonment.

could see a vacant lot between two buildings on the south side of V Street. The lot was bounded on the north by a sidewalk and on the south by an alley. In the middle of the lot was a tree. Archer observed three men, later identified as appellants Wright, Jefferson, and Bullock, engage in a brief conversation near the lot. Wright and Jefferson then took positions on the sidewalk at either side of the lot. Bullock stationed himself by the tree. A few minutes later, Carpenter arrived on a bicycle. After speaking to the other men, he took a position on the sidewalk. Archer then saw a man approach, speak briefly to Wright, and hand him what appeared to be currency. Wright went over to Jefferson and gave him the money. Wright returned to the man in the leather jacket and gave him a small white packet. The man then left. Wright returned to his post. A short time later, another man approached Wright and gave him what appeared to be money. Wright again went over to Jefferson and gave the money to him. Wright then went over to Bullock, who removed a small object from his back pocket and gave it to Wright. Wright then returned to the man who had given him the money and apparently handed the packet to him. Shortly thereafter, another man pulled up in a blue .AMC car. The driver spoke to Carpenter and gave him some money. Carpenter went over to Jefferson and had hand-to-hand contact. Carpenter then went over to Bullock and spoke to him. Bullock took a small white object out of his right rear pocket and gave it to Carpenter, who in turn gave it to the driver of the car.

At this point, Archer contacted other police officers in the area by radio and notified them that four men, whom he described, were selling drugs. Two or more police cruisers, as well as several foot patrolmen, moved in to make the arrests. Meanwhile, Bullock walked back into the corner of the vacant lot, looked under a piece of plywood covering a stepwell, removed an object, and put it in his back pocket. Wright and

Bullock were arrested at the scene. Archer directed officers at 14th and V Streets to the stepwell, where they found 18 glassine envelopes containing a white powder. Carpenter was arrested 20 minutes later near 14th and V Streets. Archer, who had met Carpenter a week earlier, identified him as one of the men involved in the apparent drug transaction.

Archer continued his observations after the arrests and saw a white van pull up to the corner of 14th and V. A man wearing a burgundy jogging suit, later identified as Ernest Austin,[2] approached the van and spoke to the driver, who got out of the van and handed Austin what appeared to be money. The two men walked along the street a short distance, and Austin passed the money to Jefferson. Archer then contacted the arrest team, which arrested Jefferson.

As police patted down Jefferson, one officer, Detective Larman, noticed a folded-over paper cup in Jefferson's right hand. He attempted to warn the other officer, but Jefferson threw the cup to Austin, who recovered it and ran away. Larman pursued Austin across 14th Street and eventually caught up with him in the 1300 block of U Street. Austin no longer had the cup. Larman retraced his steps and found a paper cup of the same description in the middle of a vacant lot. Inside the cup were 16 glassine envelopes containing a white powder, later found to have 5.1% heroin.

## II.

The indictment charged appellants with "possession with intent to distribute diacetylated morphine, that is, heroin, a Schedule I controlled substance." Appellants argue that the evidence was insufficient to show that the substance sold was a Schedule I narcotic. Specifically, they argue that (1) the evidence showed the substance recovered was heroin hydrochloride mixed with quinine and mannitol; (2) such a mixture arguably falls under Schedule III as

---

**2.** Austin was tried with appellants and convicted

of possession of heroin. He did not appeal.

well as under Schedule I; and (3) the government, therefore, had the burden of proving that this was a Schedule I, rather than a Schedule III, offense.

D.C.Code § 33–514 (1983 Supp.) provides: The controlled substances listed in this section are included in Schedule I ... Unless specifically excepted or unless listed in another schedule, any of the following opium derivatives, its salts, isomers and salts of isomers ...;

\* \* \* \* \* \*

(K) Diacetylated morphine (heroin)

Heroin hydrochloride is a salt of heroin.[3] A natural reading of the quoted portion of the statute, therefore, is that heroin hydrochloride is a Schedule I substance.

Appellants argue, however, that heroin hydrochloride, as a salt of opium, is also listed in Schedule III and thus is removed from Schedule I by the qualifying phrase, "unless listed in another schedule." There are two issues here: (1) whether heroin hydrochloride is listed in Schedule III; and (2) if so, what is the effect of the quoted qualifying phrase.

The question whether the seized substance could fall into another schedule is logically prior to the question of the meaning of the qualifying phrase. It is unlikely that appellants' argument that the substance falls into Schedule III could succeed, given the speculative nature of their argu-

ments and the clear legislative intent to include heroin in Schedule I.[4] However, because we have no trial evidence on the chemistry of opium and its derivatives, we instead resolve the issue by considering the meaning of the qualifying phrase. Given our resolution of that issue, we need not decide whether heroin hydrochloride mixtures may fall within the Schedule III designation.

■ The wording of the statute is anomalous. Almost every section in Schedules I through IV is qualified by the words, "unless listed in another schedule." Taken literally, these words would mean that any substance listed in more than one of these sections was not a controlled substance at all. Such a result obviously would be contrary to the legislative purpose, and appellants do not suggest that we so construe the statute. But the words may not be completely ignored. We therefore look to the shape of the statute as a whole, as well as to its legislative history, to determine what effect they should be given. *See Peoples Drug v. District of Columbia*, 470 A.2d 751 at 754 (D.C.1983) (plain meaning does not control where leads to absurd result).

The explicit listing of several drugs in more than one Schedule, when considered in the context of the legislative purpose, provides a guide to the proper interpreta-

**3.** In his reply brief, appellant Jefferson argues that heroin hydrochloride, while permissibly classified as a salt of heroin, may also be considered a derivative of morphine and a precursor of heroin. As long as the substance may accurately be described as a salt of heroin, however, it falls within the Schedule I classification. The fact that it may also be accurately described in other ways cannot affect this result.

**4.** Schedule III substances include:
\* \* \* \* \* \*
(4) Unless specifically excepted or unless listed in another schedule, any material, compound, mixture or preparation containing limited quantities of any of the following narcotic drugs, or any salts thereof:
\* \* \* \* \* \*
(G) Not more than 500 milligrams of opium per 100 milliliters or per 100 grams or not

more than 25 milligrams per dosage unit, with 1 or more active, nonnarcotic ingredients in recognized therapeutic amounts ....
D.C.Code § 33–518 (1983 Supp.)
Appellants argue that heroin hydrochloride is a salt of opium and accordingly falls into this classification. This argument depends on the assumption that heroin is a naturally-occurring constituent of opium. Appellants' position, however, is the weaker one that "it has not been proven that heroin is not one of [the] compounds" that form the constituents of opium.
It would follow from appellants' contention that heroin hydrochloride is a salt of opium that *a fortiori* heroin is opium. On appellants' reasoning, therefore, the listing of opium in Schedule II would preclude any prosecution of heroin offenses under Schedule I.

tion of the qualifying phrase. The most obvious examples of multiple listings are several drugs that are listed by name in three different schedules. In Schedule II, for example, codeine, ethylmorphine, opium, and dihydrocodeine are listed. Schedule III includes all four of these drugs, when mixed with other active ingredients at specified dose levels. Schedule V includes codeine, opium, and dihydrocodeine at lower dose levels than those specified in Schedule II, when mixed with other drugs having valuable medicinal properties.

Without the additional listings in Schedules III and V, any quantity of opium, for example—no matter how mixed—would be a Schedule II drug. But the purpose of the several schedules is to "relate the degree of control imposed to the potential dangers of each substance." Report on the District of Columbia Controlled Substance Act of 1981, Committee on the Judiciary, Council of the District of Columbia 1 (April 8, 1981). We therefore may readily infer that the listings in Schedules III and V remove some less dangerous preparations containing opium from the Schedule II category and place them in Schedules III and V. Because the Schedule III and V listings are more limited than the unqualified listing of "opium" in Schedule II, the latter listing when read with the qualifying phrase, "unless listed in another Schedule," is properly construed to mean any preparation containing opium *except* those specified in Schedules III and V.

■ The catch-all qualifying phrase is apparently designed to preclude the necessity for multiple amendments whenever a subcategory of a drug already listed is added to the enumeration of a different schedule. We therefore construe the words "unless listed in another schedule" to mean "unless *more specifically* listed in another schedule."[5] This construction gives effect and meaning to all multiple listings and comports with the legislative purpose.

■ Given this construction of the statutory language, the possibility that heroin hydrochloride may be a salt of opium as well as a salt of heroin need not trouble us. Although salts of opium are listed in Schedule III, the Schedule I listing includes salts of heroin and is clearly the one that more specifically applies to the seized substance. It follows that the indictment properly charged the offense and that the government offered evidence to prove all elements of the offense.[6]

### III.

■ Appellant Carpenter argues that the evidence was insufficient to show he constructively possessed the heroin. Constructive possession means that the person charged was "knowingly in a position or had the right to exercise dominion and control" over the drugs. *United States v. Hubbard*, 429 A.2d 1334, 1338 (D.C.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981). Officer Archer's testimony[7] concerning Carpenter's movements between the other appellants and the driver of the blue AMC car, taken together with the testimony of an expert on drug transactions, is sufficient to show such "dominion

---

5. This construction is consistent with our recent holding that hashish is a Schedule II substance, despite the listing of "cannabis," defined to include both hashish and marijuana, in Schedule V. *See Lawrence v. United States*, 473 A.2d 373 (D.C.1984) (per curiam).

6. The trial court properly instructed the jury that heroin was a controlled substance as a matter of law and that the jury had the task of determining whether the seized substance was in fact heroin.

7. Carpenter questions Archer's ability to see the "small white packet" measuring $2\frac{1}{2}'' \times \frac{1}{2}''$ from a distance of 120 to 130 feet. Because Archer was using binoculars, there is no reason to doubt that he could see it at that distance. Archer also testified that Carpenter's bicycle was blue. A defense witness testified, however, that Carpenter was riding a black bicycle when arrested. This does not necessarily show, as Carpenter contends, that Archer could not make out the color of the bicycle from his observation post. It was for the jury to resolve any doubts that were raised by this conflicting testimony.

and control." The expert testified that a common arrangement in drug transactions is for one man (here, Bullock) to have control of the drugs, and for another man (here, Jefferson) to have control of the money, while one or more additional persons ("runners") act as go-betweens who approach the customer, obtain the money, hand it to the "money man," then obtain the drugs from the "stash man" and deliver them to the customer. This testimony establishes the existence of " 'an ongoing criminal operation,' " *Hubbard, supra* at 1338 (quoting *United States v. Staten,* 189 U.S.App.D.C. 100, 107, 581 F.2d 878, 885 (1978)). Carpenter's activities were fully consistent with the role of "runner." While Carpenter testified in his own defense that he had merely shaken hands with the driver of the blue car, the jury apparently disbelieved him. The evidence is sufficient to support a finding of constructive possession on the basis of Carpenter's involvement in the drug transactions. *See United States v. Raper,* 219 U.S.App. D.C. 243, 249–50, 676 F.2d 841, 847–48 (1982). The failure of police to find any money or drugs on Carpenter at the time of his arrest in no way detracts from the strength of that evidence.

## IV.

Carpenter's next argument is that he was deprived of effective assistance of counsel in that his trial counsel (1) failed to make a timely motion for severance and (2) argued to the jury facts not in evidence.

■ The test for reversal on the ground of ineffective assistance is "that counsel was grossly incompetent and that counsel's incompetence ... 'blotted out the essence of a substantial defense.' " *Oesby v. United States,* 398 A.2d 1, 4 (D.C.1977) (quoting *Bruce v. United States,* 126 U.S. App.D.C. 336, 340, 379 F.2d 113, 117 (1967)). Here, counsel's failure to move for

severance early in the trial did not substantially impair Carpenter's defense because such a motion was not likely to have succeeded. Carpenter argues that severance should have been granted because the evidence solely pertaining to him was *de minimis* when compared with the evidence against the other defendants. The trial court specifically found, however, in ruling on the motions of all counsel for severance at the close of Austin's cross-examination, that much of this latter evidence would have been admissible against Carpenter in a separate trial in any event. Given this finding, it is clear that the trial court would have denied an earlier motion for severance.[8]

■ Carpenter further claims that he was prejudiced by remarks of his trial counsel during closing argument. Specifically, his counsel referred to the heroin seized as having a street value of close to $4,000. The evidence indicated that the heroin in fact had a significantly lower street value. The record, however, shows that trial counsel qualified her estimate of the value of the heroin by stating, "My math is bad." In addition, in context counsel's erroneous calculation was in appellant's favor, for she was arguing that Officer Archer was a biased witness because "[t]his was a large case for him." We therefore conclude that counsel's error did not prejudice Carpenter.

## V.

■ All appellants argue that certain remarks of the prosecutor during rebuttal argument were improper and warrant reversal for prosecutorial misconduct. Because trial counsel made no objection to these comments, we review only for "plain error." *Watts v. United States,* 362 A.2d 706, 708 (D.C.1976) (en banc).

Appellants first object to the prosecutor's reference to Carpenter's meeting with

---

**8.** As an additional ground for severance, Carpenter points out that the jurors may have been confused about the identities of the parties. As counsel could not have known of this confusion,

which came to light only at the hearing on the motion for a new trial, it has no bearing on the question of ineffective assistance.

Archer a few days before the offense as "the most incriminating thing after he finally admitted or it was stipulated that he had met Officer Archer one week before this crime." Appellants correctly point out that Carpenter's counsel stipulated as to the meeting; Carpenter did not directly admit to it. The stipulation, however, came after repeated denials by Carpenter that the meeting had ever taken place. The prosecutor's ambiguous reference was therefore a fair comment under the circumstances.

Appellants also challenge the prosecutor's reference to the meeting as "incriminating." The prosecutor's comment, however, is more naturally read to imply that Carpenter's refusal to acknowledge the meeting, rather than the meeting itself, was incriminating. It is possible that the comment unfairly suggested to the jury that the meeting itself had concerned criminal activity or charges; but we cannot say, on the basis of that possibility and the prosecutor's oblique reference, that the trial court was plainly in error for failure to declare a mistrial.

■■■ Appellants further object to the prosecutor's references during rebuttal to Officer Cora Clark, who did not testify but whose voice was heard on a tape made at the observation post. More specifically, in her rebuttal argument the prosecutor referred to Clark as a "witness" and to her voice on the tape as "testimony." Appellants argue that, because Clark had not submitted to cross-examination, the prosecutor's comments were misleading and prejudicial. They further urge that the prosecutor should have requested the court's permission before suggesting that Clark would have been a defense witness if her testimony would have been favorable to the defense.

The prosecutor's remarks, however, were made in direct response to a defense comment during closing argument that Archer's testimony was uncorroborated and to a defense suggestion that the prosecutor did not call her because her testimony would have favored the defense. We do not find the prosecutor's comments, taken in context, to constitute reversible error. *See Medina v. United States*, 315 A.2d 169, 170–71 (D.C.1974).

VI.

Appellants Bullock and Jefferson contend that the court should have granted a new trial because one of the jurors had conversed with a witness.[9] Juror Ellis had a brief conversation with Emma Spriggs, appellant Jefferson's wife, in the ladies' room during the trial. The juror expressed sympathy for Spriggs and asked her if it was true that Jefferson had been beaten at the time of his arrest. She also remarked that the jurors were having difficulty keeping clear in their own minds the identities of the various defendants and their counsel. Spriggs later testified at trial.

■■■ Appellants moved for a new trial when this conversation came to light. The trial court held a hearing at which the content of the conversation was explored. On the basis of this hearing, the court denied the motion. A conversation between a juror and a witness raises a rebuttable inference of prejudice. *Scott v. United States*, 412 A.2d 364, 370–71 (D.C.1980). Here, however, the very brief, sympathetic conversation between the juror and the witness, if it influenced the juror at all, could only have influenced her in favor of appellants. The trial court found, and we agree, that the conversation between the juror and Spriggs was not prejudicial.

■■■ Appellants further contend that the court should have granted a new trial because the jurors conversed among themselves about the case during the trial. Jur-

9. Appellee contends that this issue requires a separate appeal from the denial of the motion for a new trial. Rather than considering the procedural issue, we resolve the issue on the merits, in the interests of judicial economy and in view of the fact that the issue has been fully briefed by both parties.

or Ellis testified at the hearing on the motion for a new trial that the jurors had discussed their confusion about the identities of the various appellants and their counsel. While such discussion violated the court's instructions not to discuss the case during the trial, it was not so prejudicial as to require a new trial. There was no indication that the jurors had discussed the substantive evidence or prejudged the merits. The trial court, therefore, was well within its discretion in denying the motion for a new trial.

## VII.

Appellants Wright and Jefferson argue that the jury verdict form supplied by the trial court was prejudicial because it included all defendants and all counts on a single page. We disagree. The trial court may use any reasonable verdict form. *See United States v. Lustig*, 555 F.2d 737, 746 (9th Cir.1976), *cert. denied*, 434 U.S. 926, 98 S.Ct. 408, 54 L.Ed.2d 285 (1977), 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978). The form used was clear and straightforward. We find no merit in appellants' argument that separate forms for each defendant were necessary or even would have facilitated more careful, separate analysis of the evidence against each defendant.

## VIII.

Appellant Jefferson urges reversal based on the government's cross-examination of co-defendant Austin about his trips to the hospital for post-arrest withdrawal symptoms. Jefferson contends that this cross-examination impermissibly introduced evidence of other crimes of Austin, which may have impermissibly influenced the jury to find Jefferson guilty of the crimes charged. He adds that the trial court did not state its reasons for overruling the objections of Austin's and Jefferson's counsel to the cross-examination.

We note, however, that Austin himself testified on direct examination that he had previously been convicted of a drug-related offense. His addiction to heroin at the time of the offense, therefore, would not substantially have enhanced any inference the jury might draw from his acknowledged past behavior. Further, Austin testified on direct examination that he had received a head wound while being arrested and had gone twice to the hospital. The prosecutor used cross-examination about Austin's post-arrest withdrawal symptoms to rebut the implication that all of his hospital trips had been necessary for treatment of the head wound. In view of Austin's acknowledged drug history, as well as the fact that this cross-examination pertained only to Austin, we conclude that the "other crimes" implication was not sufficiently prejudicial to Jefferson to warrant reversal.

*Affirmed.*

