Jay BULLOCK and Kenneth V. Rawlinson, Appellants,

v.

UNITED STATES, Appellee.

Nos. 95–CF–395, 95–CF–692.

District of Columbia Court of Appeals.

Argued Oct. 8, 1997.

Decided April 2, 1998.

Janet Ann Cohen, Baltimore, MD, appointed by the court, for appellant Bullock. Steven K. Lee, Washington, DC, filed a brief for appellant Bullock.

Michael Olshonsky, Washington, DC, appointed by the court, for appellant Rawlinson.

Thomas C. Black, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Chrisellen R. Kolb and James R. Costello, Jr., Assistant

United States Attorneys, were on the brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and GALLAGHER, Senior Judge.

STEADMAN, Associate Judge:

Appellant Jay Bullock was convicted by a jury of one count of unlawful distribution of a controlled substance and one count of unlawful possession with intent to distribute a controlled substance ("PWID"). At the same trial, appellant Kenneth V. Rawlinson was convicted of one count of PWID.[1] All charges relate to a quantity of heroin that was stashed beside a tree near the corner of Georgia Avenue and Otis Place, N.W. Bullock contends that (A) the evidence was insufficient to convict him of distribution and PWID, (B) in any event he cannot remain convicted of both offenses insofar as they relate to the same quantity of heroin, and (C) the government impermissibly introduced "other crimes" evidence. He also alleges a violation of the government's duty to disclose exculpatory material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Rawlinson contends that the evidence was insufficient to convict him of PWID. We find no error and affirm the convictions of both appellants.

## I.

On the morning of March 12, 1994, Officer Richard Fitzgerald of the Metropolitan Police Department manned an observation post near the "high drug area" of Georgia Avenue and Otis Place, N.W. From approximately 10:20 a.m. until 11:10 a.m., Fitzgerald observed the two appellants and a third person, Cynthia Davis,[2] through binoculars.

### A. *The Open–Air Heroin Enterprise.*

At around 10:20 a.m., appellant Bullock emerged from an alley known for drug trafficking, engaged Davis in conversation, and gave her a bundle of objects wrapped in a plastic band. Fitzgerald believed the objects were cellophane ziplock bags. Through his binoculars, Fitzgerald watched Davis count out ten objects by "flipping through" the bundle. Davis stashed the bundle at the base of a nearby tree. Davis remained near the tree while Bullock wandered up and down the street, often looking back toward the tree.

Shortly after Bullock gave the bundle to Davis, appellant Rawlinson entered the scene. Rawlinson approached Davis and struck up a conversation. Fitzgerald could not hear what was said, but he observed Davis gesture toward the base of the tree with her head. Rawlinson nodded in response to this gesture, and he and Davis walked a short distance together. Rawlinson continued to associate with Davis throughout the surveillance period. Fitzgerald testified that Rawlinson once "motioned and directed" a passerby to Davis, who then appeared to sell drugs from the stash to the passerby.

During the fifty minutes of Fitzgerald's surveillance, a total of five or six pedestrians appeared to buy drugs from Davis. After every one or two sales, Davis would approach Bullock, appear to give him money, and then return to the tree while Bullock disappeared into the alley. Fitzgerald testified that Bullock appeared to be "more or less overlooking what [was] going on, supervising his troops." Fitzgerald also saw Rawlinson appear to make two or three drug sales to different passersby, although his testimony was unclear as to whether these sales were linked to the stash by the tree or to a different source. At one point during the observation, all three suspects conferred in a group.

At 11:10 a.m., two arrest teams moved into the area and apprehended Bullock, Rawlinson, and Davis. After Bullock's arrest, police found $115 in one of his pockets. Police found no drugs on Bullock's person, and they did not find drugs or money in the alley. Police recovered neither drugs nor money from Rawlinson after his arrest. A police officer searched the base of the tree and found two small cellophane ziplock bags hidden inside a bottle-cap. There were no other

[1]. Both the distribution and the PWID offenses are violations of D.C.Code § 33–541(a)(1) (1993).

[2]. Davis was indicted with Bullock and Rawlinson for PWID, but she pled guilty before trial.

items of significance beneath the tree. The contents of the ziplock bags were identified as heroin in a field test.

## B. *The Expert Testimony.*

At trial, an expert explained how open-air drug enterprises tend to operate. The expert identified a common pattern in which one individual, designated a "runner," would solicit potential customers and direct them to the "holder," who supervised the supply of drugs. A holder in an enterprise rarely keeps the drugs on his or her person for fear of being caught with incriminating evidence. Instead, the holder might stash the drugs in a vehicle, near a tree, or in a bag amongst litter. For the same reason, the participants in an open-air drug enterprise might arrange to have incoming cash stashed separately. Finally, the expert identified "an executive lieutenant or captain who will pass [the drugs] out to the street lieutenants for selling on the street."

Neither defendant presented any evidence.

## II.

We first address the issues presented by appellant Bullock.

## A. *The Sufficiency of the Evidence Against Bullock.*

Bullock claims the evidence was insufficient to convict him of distribution and PWID, and, for that reason, contends that the trial court erred in denying his motion for judgment of acquittal ("MJOA"). In reviewing the denial of an MJOA, we view the evidence "in the light most favorable to the government, with due regard for the jury's right to weigh the evidence and assess credibility." *Chambers v. United States,* 564 A.2d 26, 30–31 (D.C.1989); *see also Speight v. United States,* 671 A.2d 442, 454–55 (D.C.), *cert. denied,* —— U.S. ——, 117 S.Ct. 375, 136 L.Ed.2d 264 (1996). An MJOA is appropriately granted "only where there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt...." *Chambers, supra,* 564 A.2d at 31 (quoting *Williams v. United States,* 357 A.2d 865, 867 (D.C.1976)).

As for the distribution, the government presented eyewitness testimony that Bullock physically gave Davis a bundle of cellophane packets, which she deposited by the tree. Davis exchanged some of these packets with various passersby over the course of fifty minutes, but two packets remained when the police moved in. The contents of these two packets field-tested positive for heroin. The delivery of a controlled substance between two participants in a drug enterprise, whether or not an agency relationship exists, is a distribution. See *Long v. United States,* 623 A.2d 1144, 1147 (D.C. 1993), and cases cited therein. The identification testimony of even a single eyewitness is sufficient to sustain a conviction for distribution, "coupled, of course, with other evidence identifying the substance itself." *Hill v. United States,* 541 A.2d 1285, 1288 (D.C. 1988). A reasonable factfinder could conclude that Bullock distributed heroin to Davis.

Bullock's PWID conviction was based on a theory of constructive possession of the stash after it was distributed to Davis. "To establish constructive possession, the government must prove that the accused (1) knew the location of the drugs, (2) had the ability to exercise dominion and control over them, and (3) intended to exercise such dominion and control." *Earle v. United States,* 612 A.2d 1258, 1265 (D.C.1992). "Constructive possession may be established by circumstantial as well as direct evidence, and may be sole or joint possession." *Id.* (citations omitted).

There was eyewitness testimony from which a jury could infer all three elements of constructive possession. Bullock appeared to know the location of the drugs because he saw Davis place them by the tree and he periodically emerged from the alley to check on Davis and Rawlinson. There was expert testimony that a drug enterprise often includes an "executive lieutenant or captain" who keeps an eye on the runner and holder. *Cf. Griggs v. United States,* 611 A.2d 526, 527–28 (D.C.1992) (noting that expert testimony may aid the jury's understanding of drug trafficking). Moreover, the packaging of the drugs, the operation of the enterprise,

and the fact that he periodically accepted incoming cash from Davis would allow the inference that Bullock intended to distribute the remainder of the stash. *See Davis v. United States,* 623 A.2d 601, 604 (D.C.1993); *Earle, supra,* 612 A.2d at 1270. From the government's evidence, a reasonable factfinder could conclude that Bullock continued to have both the ability and the intent to exercise dominion and control over the stash.[3]

## B. *"A Legal Impossibility"?*

Having established that the evidence was sufficient as to each offense, we now address Bullock's more novel contention that he cannot remain convicted of both. Bullock argues that logically he cannot continue to possess the same heroin he already distributed to Davis; alternatively, he cannot be said to have distributed the heroin to Davis if, as the government alleged, he retained dominion and control over the stash during the fifty minutes of surveillance. To remain convicted of both distribution and PWID with respect to the same drugs, he claims, is a "legal impossibility."

We rejected a similar claim in *Allen v. United States,* 580 A.2d 653 (D.C.1990), where we affirmed convictions for both PWID and distribution even when they concerned the same contraband. The appellant in *Allen* had offered a tinfoil packet of cocaine to a passerby, but changed his mind and withdrew the packet when he saw a police car approach. *Id.* at 655. He tried to resume, but did not complete, the transaction after he thought the police car had passed. *Id.* The police had not left but remained and caught him with a total of three tinfoil packets of cocaine. *Id.* He was convicted of distribution as to the first incident[4] and PWID as to the second. *Id.* at 656.

Not unlike Bullock, the appellant in *Allen* contended that he could not remain convicted of PWID and distribution of "the same drugs in the same place to the same person at approximately the same time." 580 A.2d at 657 (footnote omitted). We disagreed and held that the offenses arose from separate acts. The key factor in *Allen* was the passage of time between the first incident and the second, which were interrupted by the passing of a police car.

> Sometime during that interval, appellant reached the "fork in the road".... After the [police] car disappeared around the corner, appellant could have chosen to put his drugs away and go home. Instead, however, he decided to try again to distribute his drugs to a prospective customer. This decision, made after the first attempt was completed, was the product of a new criminal impulse and thus was punishable separately from the earlier act....

*Id.* at 658 (citations omitted).

■ We find the *Allen* analysis appropriate to Bullock's case. Bullock gave a bundle of heroin packets to Davis, thus completing the distribution offense. At that point, Bullock reached the "fork in the road." He could have ended his participation in the enterprise and gone home, but instead, for over fifty minutes, he continued to supervise the others and periodically receive money from Davis. These acts reflected a renewed criminal impulse with respect to the heroin stash and are thus punishable separately from the earlier offense. *See Allen, supra,* 580 A.2d at 658.

There is nothing "legally impossible" about holding an individual responsible for both distribution and PWID of the same drugs on these facts.[5] Distribution is a physical act. Possession with intent to distribute, particularly under a theory of constructive possession, is a conceptual act. An individual commits the offense of distribution upon transferring physical control of the drugs. But he or she may continue to "possess" the drugs because constructive possession may encompass joint possession. *See Earle, supra,* 612 A.2d at 1265. Thus in certain circumstances our law would permit

---

3. In light of this determination, we need not reach the government's alternative theory that Bullock aided and abetted Davis's possession of the stash.

4. The statutory definition of distribution includes attempted distribution. D.C.Code § 33–501(9) (1993).

5. We note in passing that Bullock's sentences for the two offenses are concurrent, not consecutive.

convictions of both offenses, even with respect to the same quantity of drugs.[6]

We repeat our admonition in *Allen* that "[w]e would not look kindly upon a prosecution that attempted to subdivide [a single transaction] into two parts, focusing first on the period before the sale (and charging PWID) and then on the sale itself (and charging distribution)." 580 A.2d at 659. However, given the particular circumstances here, we conclude that the passage of time between Bullock's distribution of the heroin to Davis and his continuing exercise of dominion and control over the stash was enough to render the PWID a separate offense.

### C. *Bullock's* Toliver *Claim.*

Bullock next contends that the trial court erroneously admitted "other crimes" evidence, *viz.*, the five or six apparent drug sales made by Davis and the two or three apparent drug sales made by Rawlinson. The government filed a pre-trial notice of intent to introduce such evidence under *Toliver v. United States*, 468 A.2d 958 (D.C. 1983), and neither appellant objected at the trial level. Accordingly, we review for plain error and will reverse only where the error is "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc).

█ The contemporaneous activities of Davis and Rawlinson were admissible because they were "inextricably intertwined" with Bullock's PWID offense. *See Toliver, supra*, 468 A.2d at 961. The fact that Davis sold from the heroin stash was probative of Bullock's intent to distribute the drugs he gave her, and, at a minimum, the information gave the jury the complete picture of how Bullock managed his open-air drug enter-prise. *See generally Johnson v. United States*, 683 A.2d 1087, 1096–98 (D.C.1996) (en banc), *cert. denied*, —— U.S. ——, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997); *Toliver, supra*, 468 A.2d at 960–61. We detect no error, let alone plain error, in admitting the evidence.[7]

### D. *Bullock's* Brady *Claim.*

Bullock attached to his supplemental brief a photocopy of a newspaper article reporting that Officer Fitzgerald has been convicted of assaulting a suspected drug dealer. *See* Bill Miller, *D.C. Officer Convicted of Assault on Suspect*, WASH. POST, Nov. 2, 1996, at B3. The assault reportedly occurred in August 1993, several months before the surveillance and arrests of appellants in March of 1994, although the officer's November 1996 conviction occurred long after appellants' trial. Bullock contends that the U.S. Attorney's investigation of Fitzgerald—the only eyewitness to most of the events that led to appellants' convictions—should have been disclosed as *Brady* material. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Bullock argues that information about the alleged assault might have undermined Fitzgerald's credibility to the extent that it "showed his rage and animosity toward drug suspects" and "his predilection to find suspicious drug activity where none existed, as no drugs were found at the scene" of the assault. The government contends that Fitzgerald was not under investigation for the assault until after the trial of Bullock and Rawlinson.

█ We are quite unable to resolve this matter on the record before us. A newspaper article can hardly suffice. Whether the Fitzgerald assault was possibly *Brady* material is a question of fact to be addressed to the trial court in the first instance. In *Far-*

---

6. No claim has been made in this case that at the time Bullock physically handed the drugs to Davis, she was already in joint constructive possession of them. We express no view as to whether the transfer of contraband into the physical possession of a party can constitute distribution if, prior to the transfer, the recipient possessed the contraband constructively.

7. Bullock also claims that the trial court committed plain error by failing *sua sponte* to prevent Officer Fitzgerald from testifying that Davis and Rawlinson appeared to be selling drugs and that Bullock appeared to be supervising these activities. We do not believe the trial court abused its discretion in allowing Fitzgerald to explain what he believed the three suspects were doing, particularly since neither appellant raised any objection at trial.

*ley v. United States,* 694 A.2d 887 (D.C.1997), the appellant argued for the first time on appeal that a complaint against a police officer filed with the Civilian Complaint Review Board should have been disclosed as *Brady* material. We remanded the case to the trial court for a factual hearing on the *Brady* issue. *Id.* at 889–90.

The *Farley* case, however, was different from this case in an important procedural aspect: the appellant in *Farley* had filed a motion under D.C.Code § 23–110 (1996), and it was at the motions hearing that information about the complaint first surfaced. *Id.* at 887–88. Unlike the appellant in *Farley,* however, at this point neither Bullock nor Rawlinson appears to have launched a collateral attack on his conviction under § 23–110. A purpose of a § 23–110 motion is to raise factual questions that can only be answered by resort to information outside the trial record. *Cf. Ready v. United States,* 620 A.2d 233, 234 (D.C.1993). Whether the Fitzgerald assault was *Brady* material is such a question. If either appellant believes that this matter warrants further factual investigation, he may of course file an appropriate motion in Superior Court under D.C.Code § 23–110.

### III.

Finally, we address appellant Rawlinson's single contention that the trial court should have granted his MJOA because the evidence was insufficient to convict him of PWID. As with Bullock's sufficiency challenge, on appeal we view the evidence "in the light most favorable to the government, with due regard for the jury's right to weigh the evidence and assess credibility." *Chambers, supra,* 564 A.2d at 30–31. The evidence is insufficient "only where there is *no* evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt...." *Id.* at 31 (quoting *Williams v. United States,* 357 A.2d 865, 867 (D.C.1976) (emphasis added)). "The evidence need not compel a finding of guilt or negate every possible inference of innocence." *Lattimore v. United States,* 684 A.2d 357, 359 (D.C.1996).

Rawlinson's case was submitted to the jury under two alternative theories, as a principal and as an aider and abettor. We conclude that the evidence was sufficient to support a conviction under either theory.[8]

■ First, a reasonable jury could find Rawlinson guilty as a principal offender under a theory of constructive possession. The eyewitness testimony showed that Rawlinson (1) approached Davis soon after she stashed the heroin by the tree, (2) engaged her in conversation and nodded in response to her gesture to the stash, (3) associated with Davis throughout the fifty-minute surveillance, (4) conferred with both Davis and Bullock, and (5) "motioned and directed" a pedestrian to Davis, who then appeared to sell drugs to the pedestrian from the stash. The government's expert explained the role of a runner, who refers potential customers to the holder in an open-air drug enterprise.

From this evidence, the jury could infer that Rawlinson knew the location of the stash and that he shared both the ability and the intent to exercise dominion and control over the stash by the tree. *See Earle, supra,* 612 A.2d at 1265 (defining constructive possession); *cf. id.* at 1265–66 ("If the accused is found near the drugs, this may establish a prima facie case of constructive possession if there also is evidence linking the accused to an ongoing criminal operation of which the possession is a part."). Rawlinson's referral of a customer to Davis is further proof of his intent to distribute the remaining heroin. In short, Rawlinson's activities fit the expert's description of a runner. "The failure of police to find any money or drugs on [appellant] at the time of his arrest in no way detracts from the strength of that evidence," *Carpenter v. United States,* 475 A.2d 369, 375 (D.C.1984), particularly where there was expert testimony as to the reluctance of open-air drug dealers to keep their product and its proceeds on their person, *see id.* at 374–75. *See also Griggs, supra,* 611 A.2d at 527–28 ("The government's expert here provided helpful testimony establishing that an indi-

---

8. In fact, if the evidence was sufficient to support a conviction under only one of the two alternative theories, it still would be sufficient to sustain the conviction. *See Griffin v. United States,* 502 U.S. 46, 49–51, 112 S.Ct. 466, 469–70, 116 L.Ed.2d 371 (1991).

vidual need not be found in possession of drugs or marked money to be deemed a participant in a drug distribution scheme.").

■ Second, the same evidence also would have been sufficient to support Rawlinson's PWID conviction as an aider and abettor. To establish that Rawlinson aided and abetted possession with intent to distribute heroin, the government must prove that (1) someone committed the PWID offense as a principal and (2) appellant knowingly assisted or participated in the principal's offense. *See Blakeney v. United States*, 653 A.2d 365, 370 (D.C.1995).

The government's evidence was sufficient to permit a reasonable juror to find both prongs of aiding and abetting PWID. First, there was evidence that *someone* possessed the stash by the tree with the intent to distribute it, whether that someone was Davis, whose participation in the enterprise was known to the jury, or Bullock, whom the jury had convicted of PWID before it reached a decision as to Rawlinson. The trial court instructed the jurors that if they considered the aiding and abetting theory, they must agree on the identity of the principal that Rawlinson aided and abetted, whether Davis or Bullock. Second, the jury could infer from the government's evidence that Rawlinson knowingly assisted or participated in the PWID offense by acting as a runner. Davis showed Rawlinson the stash, Rawlinson nodded, and Rawlinson referred at least one buyer to Davis during the surveillance.

■ In *Lowman v. United States*, 632 A.2d 88, 90–92 (D.C.1993), we held that a runner aids and abets the offense of distribution when she directs a potential buyer to the holder.[9] Rawlinson's case is somewhat different because his PWID conviction is based on the quantity of heroin that remained in the stash *after* his participation in that particular sale. Nevertheless, in light of both the eyewitness and expert testimony, a reasonable juror could infer that Rawlinson in-

tended to assist in further sales of heroin from the stash. *See Owens v. United States*, 688 A.2d 399, 403 (D.C.1996) (affirming runner's PWID conviction under aiding and abetting theory); *see also Blakeney, supra,* 653 A.2d at 369–70 (affirming lookout's PWID conviction under aiding and abetting theory).

## IV.

For the foregoing reasons, the convictions of both appellants are

*Affirmed.*

---

**9.** The concerns expressed by the dissenting judge in *Lowman* are absent from Rawlinson's case. The dissent was concerned that the runner in that case was acting more as an agent of the buyer than as an agent of the seller. *Lowman, supra,* 632 A.2d at 94–96 (Schwelb, J., dissent-

ing). Here, however, the evidence collected during the fifty minutes of surveillance more clearly established links between the runner and the others in the enterprise than the evidence in *Lowman*.