Vashon HOWARD, Appellant,

v.

UNITED STATES, Appellee.

No. 02–CF–949.

District of Columbia Court of Appeals.

Argued May 6, 2004.

Decided Feb. 3, 2005.

Donald L. Dworsky, for appellant.

Steven R. Kaufman, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney, were on the brief, for appellee.

Before WAGNER, Chief Judge, and REID, Associate Judge, and STEADMAN, Senior Judge.*

REID, Associate Judge:

After a jury trial in April 2002, appellant Vashon Howard was convicted of possession of marijuana with intent to distribute while armed, in violation of D.C.Code §§ 48–904.01(a)(1) (2001), 22–4502 (2001), and carrying a pistol without a license, in violation of D.C.Code § 22–4504(a) (2001). On appeal, Mr. Howard primarily contends that the trial court: (1) erred in denying his motion for judgment of acquittal because the evidence was insufficient beyond a reasonable doubt to convict him on a theory of constructive possession of marijuana; and (2) in handling the issue pertaining to the Fifth Amendment privilege of potential defense witnesses, the trial court "failed to protect his Sixth Amend-

ment [r]ight" to present a defense. Unpersuaded by these, and other arguments, which we dispose of summarily, we affirm the trial court's judgment.

## FACTUAL SUMMARY

The record on appeal shows that on December 27, 2001, at approximately 6:45 p.m., Officers Anthony Greene and Orvin Boyd of the Metropolitan Police Department ("MPD") were on surveillance duty in the Southeast quadrant of the District of Columbia at a concealed observation post situated in a unmarked van parked in the 4300 block of Third Street. This area was under observation because of its reputation as a high marijuana trafficking and sales area.

The officers initially observed Mr. Howard, Dwayne Adams, and D.D. (a juvenile) lollygagging and horse playing together in this area. The distance between the observation post and the three men was approximately 25 to 30 feet. From his position in the rear of the van, Officer Greene observed D.D. and an unidentified man engage in an exchange of a small object for cash, and moments later saw Mr. Howard participate in an exchange of a small plastic object, which he removed from his coat pocket, for cash with another unidentified man. Meanwhile, from his position in the driver's seat, Officer Boyd watched Mr. Adams as he removed "a larger bag ... out of his coat," and went to the front of the vehicle parked immediately in front of the police observation van. Officer Boyd could see only "a shadow," but noticed that Mr. Adams did not have the larger bag when he walked back across the street, and stood in close proximity to D.D. and Mr. Howard.

---

* Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on October 18, 2004.

While Officer Boyd was observing Mr. Adams, Officer Greene, believing the exchanges to be narcotics sales, issued look-outs for all involved in the transactions. The look-out for Mr. Adams was based upon Officer Boyd's observation. The arrest teams responded to the look-outs and proceeded to the scene. The men became suspicious when the arrest team arrived and took flight. The buyers in both transactions ultimately eluded police capture.

Officer Boyd noticed that Mr. Adams and D.D. "[s]tayed on the sidewalk," but saw Mr. Howard as he "stepped over [a] rail" onto a grassy area and "something c[a]me from his person, an object" which the officer could not identify.[1] Officer Boyd used his police radio to say, "he just dropped something." Officer Shumac, a member of the arrest team, who had caught sight of "three men walking away" as he arrived on the scene, observed Mr. Howard "step[ ] over" a "silver pole" or a railing and "walk[ ] in the grassy area." He looked as D.D., who was walking on the sidewalk, "dropped [a] clear plastic bag, which appeared to [Officer Shumac] to contain several ziplocs of a greenish weed substance." Later the officer discovered that the "clear plastic sandwich baggie ... contained three individual ziplocs of a greenish weed substance." Officer Shumac retrieved the bag from the sidewalk and continued to follow the three men. Mr. Howard "ma[d]e a motion," and "a shiny object appeared in the air and dropped maybe a step away from him at his feet." In response to Officer Boyd's radio statement that Mr. Howard "just dropped something," Officer Shumac reportedly said, "oh, I see it, I see it, I see it. A blind man could have seen that, something like that."[2] Officer Shumac "yelled"

at another officer to stop Mr. Howard. Officer Perkins, a member of the arrest team, stopped Mr. Howard by tackling him.

At some point, Officer Shumac looked in the grassy area where Mr. Howard had dropped the "shiny object" which the officer suspected was a handgun. He saw a semi-automatic handgun. Approximately one foot from the handgun was "a clear ziploc [containing] a greenish weed substance." This ziploc bag was "[s]imilar in size," and the marijuana was "similar" in color to that handled by D.D. and Mr. Howard during their transactions with the unidentified men. It was also similar in size and color to the ziplocs retrieved from a bag in the front bumper of the vehicle parked immediately in front of the police observation van, where Officer Boyd saw Mr. Adams removing a bag from his coat. Officer Craig, who arrived on the scene in a vehicle driven by Officer Shumac, testified that after he exited the vehicle and "approached the sidewalk and grassy area ..., [he] observed what appeared to be a black handgun laying on the grass area next to a small ziploc which contained a green weed-like substance which appeared to be marijuana." After the gun was "secured" on the ground and other officers had arrived on the scene, Officer Craig assisted Officer Shumac as Officer Shumac recovered the "stash," consisting of 16 individual ziploc bags of a green weed-like substance, from the bumper of the van parked in front of the police observation vehicle. The "shiny" object turned out to be a .9mm semi-automatic handgun.

During the recovery of the contraband, Officer Greene positively identified Mr. Howard, D.D., and Mr. Adams based upon

---

1. Officer Boyd testified: "I seen a motion where [Mr. Howard's] shoulders come up, and he was still walking and I seen a shiny object fall to the ground."

2. Officer Shumac confirmed the essence of his statement as reported by Officer Boyd: "I believe I said, yes, I know. I saw it. A blind man could see that...."

their physical features and clothing, and the men were arrested. A search of Mr. Howard incident to his arrest produced no illegal narcotics, but a large sum of currency was found. The currency was given to Mr. Howard's girlfriend who had arrived on the scene. After being arrested, and while awaiting transport to police facilities for processing, Mr. Howard commented to Mr. Adams, "every time I'm up here f**king with you, I get hemmed up."

On March 27, 2002, the government filed a two-count indictment against Mr. Howard. One count charged him with possession with intent to distribute marijuana while armed, and the other with carrying a pistol without a license. At his jury trial in April 2002, the government presented: (1) physical or documentary evidence including the 9mm gun, photographs depicting a semi-automatic handgun and near it a clear ziploc bag containing a greenish weed substance, and the ziploc bags of marijuana seized from the front bumper of a van parked at the crime scene; (2) testimonial evidence from the MPD observation and arrest teams; (3) expert testimony from MPD Officer Mark Stone, who described the practice of drug trade and sales in the District of Columbia and the component roles individuals play in selling drugs as a joint venture: the "runner," the "holder," and the "enforcer"; and (4) a stipulation, establishing that Mr. Howard had a prior conviction for carrying a pistol without a license and that he did not have a license to carry a weapon.

Mr. Howard's defense was that he possessed no marijuana, and that D.D. possessed and threw the gun in Mr. Howard's direction. To support this position, Mr. Howard presented several witnesses. Andre McMillan testified that he saw D.D. "fumbling for something" and "[t]hen he dropped a black object." Ms. Bennett said D.D. "stepped in front of [Mr. Howard] and tossed the gun into the grass." Ms. Cox asserted that D.D. "threw an object over the pole" or railing. Mr. Howard also sought the testimony of others, including Mr. Adams, and D.D., to demonstrate that D.D. possessed the gun. Mr. Adams and D.D. each asserted his Fifth Amendment privilege. On April 16, 2002, the jury found Mr. Howard guilty as indicted.[3] Mr. Howard noted this timely appeal.

## ANALYSIS

### Sufficiency of the Evidence

■ Mr. Howard first contends that the trial court erred in denying his motion for judgment of acquittal ("MJOA"). He claims that the evidence was insufficient beyond a reasonable doubt to convict him based on a theory of constructive possession of marijuana. The government presented "two views" of possession at trial. During closing argument, the prosecutor contended first that Mr. Howard, Mr. Adams, and D.D. "together jointly possessed all 20 ziplock bags of marijuana." The government also presented a "narrower view," "that Mr. Howard was in possession of the one ziplock bag that was near the gun," and that bag "appeared to have the same appearance" as the one Mr. Howard had exchanged earlier for cash. On appeal, the government argues that "because conviction required merely that appellant possessed 'some amount' of marijuana with intent to distribute, even if some jurors had convicted [Mr. Howard] for possessing all 20 baggies and some had convicted him for only the one baggie, the

3. On July 24, 2002, Mr. Howard was sentenced to eight years of incarceration with five years of supervised release for possession with intent to distribute marijuana while armed, and three years of incarceration with three years of supervised release for carrying a pistol without a license, to run consecutively.

jury was still unanimous with respect to the one baggie."

▮▮ "[T]he standard by which we review a denial of an [MJOA] is *de novo,* and we, 'like the trial court, determine whether the evidence, viewed in the light most favorable to the government, was such that a reasonable juror could find guilt beyond a reasonable doubt.'" *Guzman v. United States,* 821 A.2d 895, 897 (D.C.2003) (quoting *Johnson v. United States,* 756 A.2d 458, 461 (D.C.2000) (citations omitted)); *see also Zanders v. United States,* 678 A.2d 556, 563 (D.C.1996). We again articulated the elements of constructive possession in *Rivas v. United States,* 783 A.2d 125, 129 (D.C.2001) (en banc) (citations omitted): the defendant "knew that [the contraband] was present ... and that he had both the ability and the intent to exercise dominion or control over it." In addition, "[c]onstructive possession may be sole or joint," *id.* (citing *Parker v. United States,* 601 A.2d 45, 51–52 (D.C.1991)), "and may be proven by direct or circumstantial evidence." *Id.* (citing *Brown v. United States,* 546 A.2d 390, 397–98 (D.C. 1988)).

Here, the members of the observation team testified that Mr. Howard made a sales transaction to an unidentified man, exchanging a "small plastic object," which he removed "from his coat pocket," for cash. The buyer in this transaction placed the object up to his nose for a smell inspection. Apparently satisfied, the buyer accepted the "object" without challenge. A second sales transaction occurred in Mr. Howard's presence, that between D.D. and another unidentified man. After the completion of the second individual sales transaction, Mr. Howard and D.D. shadowboxed. Officer Greene issued look-outs for the persons involved in the sales transactions, and the arrest teams responded to the area. Defense witness Andre McMillan, who had entered a nearby building to get warm after speaking with Mr. Howard, testified that he "heard someone yell jumpouts," a code word for the police. Officers Boyd and Shumac saw Mr. Howard step over a rail and onto a grassy area, and both Mr. Howard and D.D. were observed tossing or dropping objects as they walked away. These actions showed consciousness of guilt.

Three different ziploc bags were discovered at the scene of the transactions: (1) the sixteen ziploc bags that Mr. Adams had placed in the outside front part of the van parked immediately before the police van; (2) the clear plastic sandwich bag containing three ziploc bags that D.D. dropped on the sidewalk; and (3) the one ziploc bag found in the grassy area near the handgun tossed away by Mr. Howard. The ziploc bags were similar in appearance and content. As Officer Shumac testified, the one ziploc bag was "[s]imilar in size" and the marijuana was "similar" in color to the ziplocs and marijuana handled by D.D. and Mr. Howard during their transactions with the unidentified men.

A reasonable juror could find that the one ziploc bag of marijuana was possessed and thrown by Mr. Howard at the time he dropped the handgun during his attempt to flee. *See Rivas, supra,* 783 A.2d at 129. That bag, located within one foot of the handgun, was on the grassy area, and only Mr. Howard was seen in that area according to witnesses for the government. In addition, that bag appeared to resemble the bag of ziplocs handled by Mr. Adams, as well as the object that Mr. Howard had exchanged earlier for cash. And, Mr. Adams, Mr. Howard and D.D. were seen together throughout the transactions, and at the beginning of the officers' surveillance, were observed horse playing. Furthermore, there was other evidence that the men acted in concert to sell marijuana. D.D. and Mr. Howard shadowboxed after

D.D. completed his transaction, and after his arrest, Mr. Adams said to Mr. Howard: "Every time I'm up here f*cking with you, I get hemmed up." From this series of events, on a block known to be a high trafficking area for marijuana sales, a reasonable juror could infer reasonably that Mr. Howard who had exchanged one ziploc bag for cash, and who was the only person seen in the grassy area, dropped a second ziploc bag of marijuana along with the handgun, and thus not only possessed that bag of marijuana, but also had intended to sell it. *See Bullock v. United States,* 709 A.2d 87, 90 (D.C.1998) ("An MJOA is appropriately granted 'only where there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt....' ") (citations omitted). Accordingly, "view[ed] in the light most favorable to the government,' " *Guzman, supra,* 821 A.2d at 897, and cognizant that possession may be established by direct or circumstantial evidence, *Bullock, supra,* 709 A.2d at 90, we conclude that the evidence presented was legally sufficient for the jury to find beyond a reasonable doubt that Mr. Howard was guilty of the offense of possession of marijuana with intent to distribute while armed. *See Rivas, supra,* 783 A.2d at 129.

### Right to compel testimony

Mr. Howard contends that the trial court improperly handled the issue pertaining to the Fifth Amendment privilege of potential defense witnesses, Mr. Adams and thus, "failed to protect [his] Sixth Amendment Right." Specifically, he maintains that the trial court (1) failed to follow a question by question procedure with respect to Mr. Adams after he decided that he wished to testify; and (2) failed to allow Mr. Adams to consult with counsel after deciding he wished to testify, and hence, appeared to "persuade a willing witness not to testify." And, he generally criticizes the trial court for failing to follow our edict in *Carter v. United States,* 684 A.2d

331 (D.C.1996) because: "The Court never asked the government if it would debrief or immunize the witnesses with prospective Fifth Amendment privileges"; and "it did not take the independent steps required by *Carter* to protect Mr. Howard's Sixth Amendment right."

The government maintains that the trial court assiduously and without error protected Mr. Howard's constitutional rights, in spite of his Sixth Amendment right yielding to Mr. Adams' Fifth Amendment privilege. The government further asserts that the trial court "neutrally advised" Mr. Adams of the implications of testifying after he sought to waive his Fifth Amendment privilege in the absence of counsel even though, earlier, he agreed with his counsel's advice and invoked the privilege. The government also contends that "the proposed testimony regarding who dropped the gun was cumulative and obtainable from other sources." Howard's right to compel testimony.

We conclude that even assuming, without deciding, that the trial court committed error with respect to its handling of the Fifth and Sixth Amendment issue, resulting in no testimony by Mr. Adams, the error was harmless. Three defense witnesses—Mr. McMillan, Ms. Bennett, and Ms. Cox—all presented testimony designed to show that D.D., not Mr. Howard, possessed the gun. Therefore, testimony from Mr. Adams stating that D.D. had the gun and threw it onto the grassy area would have been cumulative of testimony from these three witnesses. Indeed, when the issue regarding these witnesses was raised on the first day of Mr. Howard's trial, defense counsel told the trial judge:

> [M]ost of these witnesses are going to be short testimony, just we saw [D.D.] throw the gun. It is clear from all indication that [D.D.] threw the gun, not Mr. Howard. That's the extent—

that's what everything hangs on. It's while armed. If he didn't have a gun, he wasn't while armed.

And, so all these people, there doesn't seem to be any reason to go into any other events surrounding this, other than what did you see, I saw [D.D.] throw the gun.

And later during the trial, in response to the trial court's request for a proffer as to the testimony of Mr. Adams if he were called as a witness, defense counsel stated: "Mr. Adams was out there in the group and clearly saw [D.D.] throw the weapon down and clearly saw that Mr. Howard did not."

We have adhered to the principle that a trial court may limit the admission of testimony that is cumulative. *See Hurt v. United States*, 337 A.2d 215, 217 (D.C. 1975) (citing 1 J. WIGMORE, EVIDENCE § 198 at 676–77 (3d ed. 1940)). Since three witnesses gave testimony which pointed to D.D. as the person who tossed the gun onto the grassy area, the proposed testimony from Mr. Adams would have been cumulative. Further-

more, given the testimony of the police officers, the government's case against Mr. Howard was strong. Thus, any error regarding the Fifth Amendment privilege and the testimony of Mr. Adams "was harmless beyond a reasonable doubt." *Johnson v. United States*, 686 A.2d 200, 203–04 (D.C.1996) (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).[4]

### *Other Arguments*

■ We dispose of Mr. Howard's other arguments summarily. Mr. Howard argues that the trial court *sua sponte*, was required to provide a special unanimity instruction,[5] despite his counsel's failure to request it, because the indictment was not specific as to which bag or bags of marijuana he possessed with intent to distribute, and Super. Ct.Crim. R. 31(a) requires unanimity.[6] We review this challenge for plain error. As we said in *McKinnon v. United States*, 644 A.2d 438 (D.C.1994):

In order to demonstrate plain error 'it is not enough to show ... that the evidence, relevant to a single count, reveals

---

4. Mr. Howard also claims that the trial court improperly dealt with potential testimony from D.D. that he possessed the gun. But D.D. plainly had a Fifth Amendment right which he invoked, and his testimony would be cumulative and available from other sources. *See Carter, supra,* 684 A.2d at 344. Furthermore, although Mr. Howard argues that the trial court should have allowed him additional time "to bring in a perfected statement [from D.D.] that would satisfy the [trial c]ourt about the statement's reliability," a copy of the alleged statement was produced belatedly (the trial judge described it as "out of the blue"), and was unsworn. Under the circumstances, the trial court did not abuse its discretion in denying a continuance to attempt to "perfect" the statement.

5. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.72, Special Unanimity (4th ed. 1993).

Defendant has been charged with one count of possession with intent to distribute.

There has been evidence of more than one act or incident upon which a conviction on this count may be based. ( [Possessing the one ziploc bag of marijuana recovered near the handgun or possessing the sixteen ziploc bags of marijuana in the "stash".] ) You may find the defendant guilty on this count if the government proves beyond a reasonable doubt that defendant committed either of these acts/incidents. However, in order to return a guilty verdict on this count, all jurors must unanimously agree as to at least one of these specific acts/incidents. In other words, you must all agree that defendant committed ( [Possessing the one ziploc bag of marijuana recovered near the handgun] ) or that defendant committed [ (possessing the sixteen ziploc bags of marijuana in the "stash")].

6. Super. Ct.Crim. R. 31(a) provides: "The verdict shall be unanimous."

... two or more incidents which might be sufficiently separate to warrant, if requested, a special unanimity instruction ....' Rather, appellant must show that the lack of a unanimity instruction jeopardized the fairness and integrity of his trial.

*Id.* at 441 (citations omitted); *see also Smith v. United States,* 591 A.2d 229, 232–33 (D.C.1991) ("While we recognize that reliance upon [the government's views of possession] ... could present potential jury unanimity problems, no such objection was raised at trial or request for a unanimity instruction made, and we perceive no 'plain error' in that regard.") (citing *Shivers v. United States,* 533 A.2d 258, 263 (D.C.1987)). Here, defense counsel did not request a special unanimity instruction either during the presentation of the government's evidence, or after the prosecutor's closing argument where "two views" of possession were presented to the jury. On this record, we see no plain error.

■ Mr. Howard claims that the drug expert for the government "impermissibly testified about [Mr. Howard's] mental state in response to an improper hypothetical question," because of the government's "failure to include all the material facts" in the hypothetical question posed during redirect examination. Since Mr. Howard did not raise this objection at trial, we review it "in accordance with the extremely limited plain error standard." *Spriggs v. United States,* 618 A.2d 701, 704 (D.C.1992).

Even assuming error, we see no prejudice to Mr. Howard based on the expert's testimony. Other evidence was introduced from which a reasonable juror could infer reasonably that Mr. Howard possessed marijuana with intent to distribute it. Moreover, it was clear from the expert's testimony that he had no knowledge of the specific circumstances of the case, and did not directly testify about Mr. Howard's guilt. *See Spencer v. United States,* 688 A.2d 412, 418 (D.C.1997).

■ Finally, Mr. Howard asserts that at various points during the course of his trial, the prosecutor introduced "prejudicial" predisposition evidence. In particular, during his opening and closing arguments, the prosecutor made reference to Mr. Howard's prior conviction for carrying a pistol without a license. We review this matter for plain error. *See Harris v. United States,* 618 A.2d 140, 148 (D.C. 1992). We detect no error let alone plain error. Since the indictment referenced Mr. Howard's prior conviction, and he agreed to a stipulation regarding it, jurors obviously were aware of that conviction. Even assuming error, it was not "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Harris, supra,* 618 A.2d at 148. Indeed, the trial judge gave an immediate curative instruction after the prosecutor read the stipulation to the jury.[7] Consequently, Mr. Howard cannot prevail on his predisposition argument.

7. The trial court stated:
Ladies and gentlemen, when I instruct you with respect to the carrying a pistol without a license offense, I'll be instructing you that you have to find as one of the elements there had been a prior conviction under a particular statute. Doesn't matter what that statute was. The parties have stipulated to the conviction under that statute. What the nature of the offense was. The nature of the offense doesn't make a difference. As to whether he's—Mr. Howard is guilty or not guilty of this offense that he has a prior conviction. You shouldn't speculate about the nature of the underlying offense. They just have to prove he had one. And then you are to consider all of the other elements of the offenses. But don't speculate about the nature of the offense. The nature of the offense shouldn't have any impact upon whether or not he possessed the—carried the pistol without a license in this case.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*